Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/13/2022 08:08 AM CDT

Gwen Vargas Porter, Special Administrator
of the Estate of Curtis W. Blackbird and
next friend of Nathan Mitchell, a minor
child, appellant, v. Knife River, Inc.,
a Delaware corporation,
et al., appellees.

___ N.W.2d ___

Filed February 18, 2022.    No. S-20-578.

1. **Summary Judgment: Appeal and Error.** An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.

2. ____: ____. In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.

3. **Statutes: Appeal and Error.** Statutory interpretation presents a question of law which an appellate court reviews independently of the lower court.

4. **Summary Judgment.** The primary purpose of the summary judgment procedure is to pierce the allegations in the pleadings and show conclusively that the controlling facts are other than as pled.

5. **Summary Judgment: Proof.** The party moving for summary judgment must make a prima facie case by producing enough evidence to show that the movant is entitled to judgment if the evidence were uncontroverted at trial. If the party moving for summary judgment makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law.

6. **Summary Judgment.** At the summary judgment stage, the trial court determines whether the parties are disputing a material issue of fact. It

does not resolve the factual issues. Where reasonable minds could draw different conclusions from the facts presented, there is a triable issue of material fact.

7. **Negligence: Proof.** To prevail in any negligence action, a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and resulting damages.

8. **Negligence.** The question whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation.

9. **Statutes: Legislature: Intent: Appeal and Error.** The fundamental objective of statutory interpretation is to ascertain and carry out the Legislature's intent. When construing a statute, an appellate court looks to the statute's purpose and gives to the statute a reasonable construction that best achieves that purpose, rather than a construction that would defeat it.

10. **Statutes: Legislature: Intent.** In construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.

11. **Statutes: Appeal and Error.** To give effect to all parts of a statute, an appellate court will attempt to reconcile different provisions so they are consistent, harmonious, and sensible, and will avoid rejecting as superfluous or meaningless any word, clause, or sentence.

12. **Highways.** Neb. Rev. Stat. § 39-1345 (Reissue 2016) describes the authority and responsibilities of the Nebraska Department of Transportation regarding temporary closures of state highways.

13. **Statutes: Legislature: Negligence: Public Policy.** A court may look to a statute or regulation as reflecting the standard of care which the Legislature has set as a matter of public policy.

14. **Highways.** Traffic control devices such as barricades placed at the termini of a closed road need not absolutely prevent entrance.

15. **Highways: Contractors and Subcontractors: Negligence: Notice.** A highway contractor is not required in the exercise of reasonable care to place signals or flares at intermediate places on a highway under construction in order to give notice that machinery is being used thereon or that defects due to construction exist, where warning signals and barricades at the termini thereof give notice that the highway is under construction and the condition of the highway itself shows that it is under various stages of completion.

Appeal from the District Court for Thurston County: John E. Samson, Judge. Affirmed.

Nicholas R. Glasz, of Glasz Law Firm, for appellant.

Stephen G. Olson II, of Engles, Ketcham, Olson & Keith, P.C., for Knife River, Inc.

Patrick R. Guinan, of Erickson | Sederstrom, P.C., for appellee D.P. Sawyer, Inc.

Patrick L. Sealey, of Heidman Law Firm, P.L.L.C., for appellee A.M. Cohron & Son, Inc.

Michael L. Storey and Mark E. Novotny, of Lamson, Dugan & Murray, L.L.P., for appellee M.E. Collins Contracting Company, Inc.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Miller-Lerman, J.

## NATURE OF CASE

Officer Curtis W. Blackbird died on duty responding to an emergency domestic violence call when his police cruiser crashed into a parked crane on a portion of Highway 94 that was closed for construction. Blackbird's widow, Ardetta Blackbird, as special administrator of Blackbird's estate and as next friend of Blackbird's son, Nathan Mitchell, filed this negligence action in the district court for Thurston County alleging negligent maintenance of a construction site against the highway construction contractors and subcontractors (collectively the contractors). The district court granted summary judgment in favor of the contractors. Blackbird's widow, as special administrator, appealed. During the pendency of this appeal, she passed away, and upon motion, Gwen Vargas Porter was substituted as special administrator (Administrator). The evidence was undisputed that the contractors met their obligations, including those under Neb. Rev. Stat. § 39-1345 (Reissue 2016) pertaining to the erection of suitable barricades and signs to notify motorists that Highway 94 was closed

for construction. We conclude that there was no triable issue of fact and that the contractors were entitled to summary judgment. Accordingly, we affirm the order of the district court which granted summary judgment in favor of the contractors.

## STATEMENT OF FACTS

Blackbird was on duty with the Omaha Tribal Police when his police cruiser tragically collided with a 50-ton "Crawler" crane parked on a portion of Highway 94 which was closed for construction. In the early hours of March 26, 2017, Blackbird received an emergency domestic violence call. In order to respond, Blackbird needed to travel from Macy, Nebraska, to Walthill, Nebraska. A westbound portion of Highway 94 was the fastest route from Macy to Walthill, but was designated by the Nebraska Department of Transportation (NDOT) as closed for construction. Despite the closure, Blackbird entered the closed roadway by maneuvering around barricades and proceeded on Highway 94. In the dark night, Blackbird's police cruiser collided with the crane that was parked on the highway, and Blackbird, who was not wearing a seatbelt, died as a result of injuries sustained in the collision.

Another officer with the Omaha Tribal Police, Ben Carrillo, had responded to the same call. He was driving ahead of Blackbird on Highway 94 and successfully navigated around the parked crane in the westbound lane. Carrillo had driven through the same route from Macy to Walthill earlier in the same shift. According to Carrillo, the highway had been closed for "quite some time." Carrillo testified that he and the other officers with whom he worked regularly drove around road-closed signs to respond to emergencies. After Carrillo passed the crane, he looked in his rearview mirror and noticed that he could no longer see the headlights of Blackbird's police cruiser. He turned his cruiser around and observed that Blackbird had collided with the crane.

A Nebraska State Patrol certified accident reconstructionist investigated the collision scene. In his report, he concluded

that it was a typical closure for state projects and that the signs and barricades required were in place at the proper locations. He stated the road closure barricades were "not something that you would have missed. . . . You had to take — I had to take some sort of evasive maneuver to get around them, meaning I had to leave the roadway to get around them." He contacted the site supervisor, who stated that people had driven around the barricades when the construction crew was not present.

The contractors, who are the appellees in this case, include (1) Knife River, Inc., the general contractor for the Highway 94 construction project; (2) M.E. Collins Contracting Company, Inc., a subcontractor hired by Knife River and responsible for the paving project; (3) A.M. Cohron & Son, Inc., a sub-subcontractor hired by Collins and responsible for bridge, road, and culvert work (and the owner of the crane with which Blackbird's police cruiser collided); and (4) D.P. Sawyer, Inc., a subcontractor hired by Knife River and responsible for traffic control and barricading.

The NDOT owned the construction project on Highway 94. A traffic control plan for the Highway 94 project was developed and approved by the NDOT using the standard and typical plan. It complied with the Manual on Uniform Traffic Control Devices (2009) (MUTCD). The MUTCD is the "national standard for all traffic control devices installed on any street, highway, or bicycle trail open to public travel." 23 C.F.R. § 655.603(a) (2021). Section 1A.07 of the MUTCD provides that "[t]he responsibility for the design, placement, operation, maintenance, and uniformity of traffic control devices shall rest with the public agency or the official having jurisdiction . . . ."

The NDOT contracted with Knife River for the Highway 94 project. In February 2017, due to cracking in an earth slope near a culvert that ran under the highway, a change order was negotiated that expanded the original scope of work, and Knife River subcontracted with M.E. Collins Contracting Company, who subcontracted with A.M. Cohron & Son. A.M. Cohron

& Son took control of the Highway 94 project on March 20. The area of the slope repair work was designated a "Work Area" and was closed for the duration of the repair. A.M. Cohron & Son deployed the crane, which it owned and controlled, into the westbound lane of Highway 94 on March 21. The crane could only be operated from the roadway due to the conditions at the site. As marked in the traffic control plan, the crane was parked in a section of the highway that was a "hard closure," meaning such section was closed to all traffic.

The undisputed evidence indicates that all traffic devices required by the traffic control plan were in place and operational in the early hours of March 26, 2017, the day of the collision. The Administrator's expert offered an observation that more robust barricades and signs were available. Blackbird proceeded past nine barricades and five signs all indicating the highway was closed. Carrillo told the accident reconstructionist that when Carrillo entered the east side of the work area, he slowed down to about 5 m.p.h. so he could leave the roadway and drive around the barricades.

This action was brought against the contractors, claiming that they were jointly and severally liable for negligence—leaving the crane on the highway without adequate illumination, barricades, or other traffic control—and that such negligence was the proximate cause of Blackbird's death. Specific claims of negligence were made against each of the contractors.

The district court sustained the contractors' motions for summary judgment. In its order, the court determined that the contractors were entitled to summary judgment as a matter of law based on several theories in the alternative, including the failure of the Administrator's prima facie case of negligence, and based on several affirmative defenses, including contributory negligence and assumption of risk. The court therefore granted the contractors' motions for summary judgment and dismissed the complaint with prejudice. The Administrator appeals.

## ASSIGNMENT OF ERROR

The Administrator assigns, summarized and restated, that the district court erred when it granted summary judgment in favor of the contractors.

## STANDARDS OF REVIEW

[1,2] An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law. *In re Estate of Lakin, ante* p. 271, 965 N.W.2d 365 (2021). In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence. *Id*.

[3] Statutory interpretation presents a question of law which an appellate court reviews independently of the lower court. *In re William R. Zutavern Revocable Trust*, 309 Neb. 542, 961 N.W.2d 807 (2021).

## ANALYSIS

The Administrator claims that the district court erred when it granted summary judgment in favor of the contractors. We find no merit to the Administrator's claim, and we therefore affirm.

[4-6] We note at the outset that summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Wintroub v. Nationstar Mortgage*, 303 Neb. 15, 927 N.W.2d 19 (2019). See *In re Estate of Lakin, supra*. We have noted that the primary purpose of the summary judgment procedure is to pierce the allegations in the pleadings and show conclusively that the controlling facts are other than as pled. *Williamson v. Bellevue*

*Med. Ctr.*, 304 Neb. 312, 934 N.W.2d 186 (2019). The party moving for summary judgment must make a prima facie case by producing enough evidence to show that the movant is entitled to judgment if the evidence were uncontroverted at trial. *Id.* If the party moving for summary judgment makes a prima facie case, the burden shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law. *Id*. At the summary judgment stage, the trial court determines whether the parties are disputing a material issue of fact. It does not resolve the factual issues. *Id*. Where reasonable minds could draw different conclusions from the facts presented, there is a triable issue of material fact. *Id*.

[7,8] To prevail in any negligence action, a plaintiff must show a legal duty owed by the defendant to the plaintiff, a breach of such duty, causation, and resulting damages. *Lewison v. Renner*, 298 Neb. 654, 905 N.W.2d 540 (2018). The question whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *A.W. v. Lancaster Cty. Sch. Dist. 0001*, 280 Neb. 205, 784 N.W.2d 907 (2010).

[9-11] The meaning of § 39-1345, which concerns the closure of state highways by the NDOT, is central to our analysis regarding the Administrator's claim that the contractors working on the closed highway were negligent. The fundamental objective of statutory interpretation is to ascertain and carry out the Legislature's intent. *In re William R. Zutavern Revocable Trust, supra*. When construing a statute, an appellate court looks to the statute's purpose and gives to the statute a reasonable construction that best achieves that purpose, rather than a construction that would defeat it. *Id*. In construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense. *Yagodinski v. Sutton*, 309 Neb. 179, 959 N.W.2d 541 (2021). To give effect to all parts of a statute, an appellate court will

attempt to reconcile different provisions so they are consistent, harmonious, and sensible, and will avoid rejecting as superfluous or meaningless any word, clause, or sentence. *Id.*

[12] With these general rules of statutory construction in mind, we turn to § 39-1345, which describes the authority and responsibilities of the NDOT regarding temporary closures of state highways. Section 39-1345 provides:

> The [NDOT] shall have the authority to close temporarily any part or all of a highway. *Whenever the [NDOT] closes such highway or part thereof, the [NDOT] or its contractor shall erect, at both ends of the portion of the highway so closed, suitable barricades, fences, or other enclosures and shall post signs warning the public that the highway is closed by authority of law. Such barricades, fences, enclosures, and signs shall serve as notice to the public that such highway is unsafe and that anyone entering such closed highway, without the permission or consent of the [NDOT], does so at his own peril.* The [NDOT], if it deems it advisable, may permit the public use of a highway undergoing construction, repair, or maintenance in lieu of a detour route and is authorized to regulate, limit, or control traffic thereon.

(Emphasis supplied.)

This case presents an issue of first impression concerning the meaning of the sentences italicized above. Under § 39-1345, when a highway is closed by the NDOT, the NDOT or its contractor "shall erect, at both ends of the portion of the highway so closed, suitable barricades, fences, or other enclosures and shall post signs warning the public that the highway is closed by authority of law." This "shall serve as notice to the public that such highway is unsafe and that anyone entering such closed highway, without the permission or consent of the [NDOT], does so at his own peril." § 39-1345. Because Blackbird did not have permission to enter the highway, he was among the class of entrants to which the barricade and notice requirements of § 39-1345 apply.

[13] Section 39-1345 informs our analysis as to the existence of the contractors' duty as well as the standard of care. With respect to the latter, we have observed that we may look to a statute or regulation as reflecting the standard of care which the Legislature has set as a matter of public policy. See *Murray v. UNMC Physicians*, 282 Neb. 260, 806 N.W.2d 118 (2011). Read in context, § 39-1345 describes the scope of the duty to warn the public of the existence and dangers of a closed highway and is consistent with the evidence presented by the parties regarding the standard of care.

Under § 39-1345, warning signs and "suitable" barricades, fences, or other enclosures must be placed "at both ends of the portion of the highway so closed." A subsequent phrase, "anyone entering . . . does so at his own peril," is a limitation on the scope of the duty of the NDOT and its contractors to entrants of a closed highway who proceed without permission or consent of the NDOT. By referencing these different portions of § 39-1345, we are faithful to the principles of statutory interpretation under which we give meaning to the full statute and do not reject as superfluous or meaningless any word, clause, or sentence. See *Yagodinski v. Sutton*, 309 Neb. 179, 959 N.W.2d 541 (2021).

With the understanding that the contractors were required by statute to place "suitable" barricades or other traffic control devices, we turn to our record. There is no dispute that the entrance to the "hard closure" portion of the highway was barricaded with numerous traffic control devices and warnings. And the contractors established through testimony and documents in evidence that the traffic control devices complied with the traffic control plan and that the traffic control plan, in turn, complied with § 1A.07 of the MUTCD. Compliance with the MUTCD is not all that the contractors were required to show; they were also required to exercise ordinary care in the selection of devices. See *Kirkwood v. State*, 16 Neb. App. 459, 748 N.W.2d 83 (2008). See, also, *Tadros v. City of Omaha*, 269 Neb. 528, 694 N.W.2d 180 (2005). In this case, the contractors'

witnesses referred to the traffic control plan and the MUTCD as embodying what a reasonable person in the industry would do in general, see *Norman v. Ogallala Pub. Sch. Dist.*, 259 Neb. 184, 609 N.W.2d 338 (2000), and in particular, the contractors' witnesses stated that the devices selected in this matter were appropriate. The Administrator and her expert agree the contractors were required to implement the traffic control plan in place at the time of the collision. See *Lindsay Mfg. Co. v. Universal Surety Co.*, 246 Neb. 495, 519 N.W.2d 530 (1994). Moreover, certain testimony showed that had the contractors installed different or additional devices, their highway closure would have impermissibly deviated from the traffic control plan. And although the Administrator's expert hypothesized about the potential of using additional warning devices, he did not identify any legally meaningful act or omission by the contractors which would show that the devices actually selected were not "suitable" or which would call into question the contractors' exercise of due care. The evidence presented by the Administrator failed to create a genuine issue of material fact on the issue of the suitability of the contractors' traffic control devices or the reasonableness of the traffic control plan under the circumstances.

[14] With regard to the placement of "suitable" traffic control devices, § 39-1345 requires that such warnings be "at both ends" of the highway closure. Carrillo, the officer who travelled ahead of Blackbird just prior to the collision, testified that to enter the portion of the closed highway, and circumvent the barricades, he reduced his speed, physically exiting the road until he could reenter the closed highway. Traffic control devices such as barricades placed at the termini of a closed road need not absolutely prevent entrance. See *Gorges v. Dobson Bros. Constr. Co.*, 187 Neb. 19, 187 N.W.2d 91 (1971). Thus, there is no reasonable dispute that in this respect the barricades and other traffic control devices were suitable and thus met the requirements set forth by § 39-1345.

[15] Although the Administrator introduced testimony that further measures could have been taken to mark and illuminate individual hazards located within the closed construction zone, we have explained:

> A highway contractor is not required in the exercise of reasonable care to place signals or flares at intermediate places on a highway under construction in order to give notice that machinery is being used thereon or that defects due to construction exist, where warning signals and barricades at the termini thereof give notice that the highway is under construction and the condition of the highway itself shows that it is under various stages of completion.

*Lyon v. Paulsen Building & Supply, Inc.*, 183 Neb. 365, 368, 160 N.W.2d 191, 194 (1968). In fulfilling their duty, the contractors exercised ordinary care, and the Administrator did not introduce evidence to the contrary; there is no triable issue of fact.

## CONCLUSION

This appeal involves a fatal single-vehicle accident on a closed highway. As explained above, by reference to the provisions of § 39-1345, we have concluded that the contractors owed a duty to Blackbird, that the statute and evidence inform us regarding the standard of care, and that the contractors offered evidence that showed they exercised ordinary care. Even giving the Administrator the favorable inferences from the evidence, there was no triable issue of fact. The district court did not err when it entered an order of summary judgment in favor of the contractors, and accordingly, we affirm.

Affirmed.