Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/05/2023 08:06 AM CDT

Brad Carson and Jamie Carson, individually and
as next friends of Boston Carson, a minor,
appellants, v. Rebecca Steinke, M.D., and
Douglas Boon, M.D., appellees.

___ N.W.2d ___

Filed May 5, 2023.    No. S-21-873.

1. **Malpractice: Physicians and Surgeons: Expert Witnesses.** Under
   Neb. Rev. Stat. § 44-2810 (Reissue 2021), a party who seeks to present
   expert testimony on the standard of care in a medical malpractice case
   must demonstrate familiarity with the standard of care in the defendant's
   locality or a similar locality.
2. **Trial: Expert Witnesses: Appeal and Error.** An appellate court
   reviews de novo whether the trial court applied the correct legal stan-
   dards for admitting an expert's testimony, and an appellate court reviews
   for abuse of discretion how the trial court applied the appropriate stan-
   dards in deciding whether to admit or exclude an expert's testimony.
3. **Judgments: Words and Phrases.** An abuse of discretion occurs when a
   trial court's decision is based upon reasons that are untenable or unrea-
   sonable or if its action is clearly against justice or conscience, reason,
   and evidence.
4. **Trial: Expert Witnesses: Proof.** It is the burden of the proponent of
   expert testimony to establish the necessary foundation for its admission.
5. **Malpractice: Physicians and Surgeons: Expert Witnesses.** Expert tes-
   timony offered to establish the standard of care in a medical malpractice
   case is admissible only if its proponent can demonstrate the expert's
   familiarity with the relevant standard of care in the defendant's com-
   munity or a similar community.
6. **Malpractice: Physicians and Surgeons: Words and Phrases.** Neb.
   Rev. Stat. § 44-2810 (Reissue 2021) defines the general standard
   of care in medical malpractice cases as the ordinary and reasonable
   care, skill, and knowledge ordinarily possessed and used under like

circumstances by members of their profession engaged in a similar practice in their or in similar localities.

7. ____: ____: ____. To determine what constitutes ordinary and reasonable care, skill, and diligence under Neb. Rev. Stat. § 44-2810 (Reissue 2021), the test is that which health care providers, in the same community or in similar communities and engaged in the same or similar lines of work, would ordinarily exercise and devote to the benefit of their patients under like circumstances.

8. **Malpractice: Physicians and Surgeons: Expert Witnesses.** Expert testimony concerning the standard of care in a medical malpractice case should not be received if it appears the witness is not in possession of such facts as will enable him or her to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture.

9. **Trial: Expert Witnesses.** In general, expert testimony is admissible only if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.

10. ____: ____. Where an expert's opinion is mere speculation or conjecture, it is irrelevant and cannot assist the trier of fact.

11. **Malpractice: Physicians and Surgeons.** Neb. Rev. Stat § 44-2810 (Reissue 2021) should be interpreted in light of its general purpose to define the standard of care to which a defendant is to be held in medical malpractice cases.

12. ____: ____. The purpose of Neb. Rev. Stat § 44-2810 (Reissue 2021) to define the standard of care to which a defendant is to be held in medical malpractice cases would not be served if the similarity of two communities could be determined by considering characteristics that are irrelevant to the level of medical care that is to be expected.

13. ____: ____. A court considers medically relevant factors, including available facilities, personnel, equipment, and practices, to determine whether two communities are similar under Neb. Rev. Stat § 44-2810 (Reissue 2021).

14. **Malpractice: Physicians and Surgeons: Expert Witnesses: Proof.** The burden is on the proponent of standard-of-care testimony to demonstrate that the expert is familiar with the customary practice among physicians in the defendant's community or a community that is similar in terms of available resources, facilities, personnel, practices, and other medically relevant factors.

15. ____: ____: ____: ____. If a party cannot demonstrate his or her expert's familiarity with the standard of care in the defendant's community or a community that is similar, then the expert's testimony is properly excluded.

16. **Malpractice: Physicians and Surgeons: Statutes: Public Policy: Legislature: Appeal and Error.** An appellate court cannot depart from the customary standard of care on policy grounds, even if is subject to criticism, because the standard of care is defined by statute and public policy is declared by the Legislature.

17. **Malpractice: Physicians and Surgeons: Legislature: Appeal and Error.** An appellate court cannot read a burden-shifting framework into Neb. Rev. Stat § 44-2810 (Reissue 2021) that the Legislature did not put into it.

18. **Malpractice: Physicians and Surgeons: Expert Witnesses.** Expert testimony establishing a national standard of care is admissible if the expert can establish that the national standard of care does not differ in the defendant's community or a similar community.

19. **Trial: Expert Witnesses.** A trial court acts as gatekeeper to ensure the reliability of an expert's opinion.

20. ____: ____. A trial court is not required to exercise the gatekeeping function from *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), where expert testimony is challenged on the basis of lack of foundation.

21. **Pretrial Procedure: Expert Witnesses.** An important aspect of each party's trial preparation is the discovery of the opinions that the opposing party's expert witness will state at trial.

22. **Pretrial Procedure.** Pretrial discovery enables litigants to prepare for trial without the element of an opponent's tactical surprise.

23. **Directed Verdict.** A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.

24. **Directed Verdict: Appeal and Error.** In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence.

25. **Malpractice: Physician and Patient: Proof: Proximate Cause.** To make a prima facie case for medical malpractice, a plaintiff must show (1) the applicable standard of care, (2) that the defendant(s) deviated from that standard of care, and (3) that this deviation was the proximate cause of the plaintiff's harm.

26. **Malpractice: Physicians and Surgeons: Expert Witnesses.** Except in limited circumstances, expert testimony is required on each element of a medical malpractice claim.

27. **Malpractice: Physicians and Surgeons: Expert Witnesses: Proof.** To satisfy the burden to establish each element of medical malpractice by expert testimony, the expert's opinion must be sufficiently definite and relevant to provide a basis for the fact finder's determination of an issue or question.

28. **Malpractice: Physicians and Surgeons: Expert Witnesses: Words and Phrases.** Medical expert testimony regarding causation based upon possibility or speculation is insufficient; it must be stated as being at least "probable," in other words, more likely than not.

29. ____: ____: ____: ____. Although expert medical testimony need not be couched in the magic words "reasonable medical certainty" or "reasonable probability," it must be sufficient as examined in its entirety to establish the crucial causal link between the plaintiff's injuries and the defendant's negligence.

30. **Malpractice: Physicians and Surgeons: Expert Witnesses: Proof.** Even when an opinion purports to rise to a reasonable degree of medical certainty or probability, it does not satisfy the burden of proof on causation in a medical malpractice case if the outcome is not sufficiently definite.

Appeal from the District Court for Hall County: Mark J. Young, Judge. Affirmed.

Diana J. Vogt and James L. Schneider, of Sherrets, Bruno & Vogt, L.L.C., and Sarah Centineo, of Centineo Law, P.C., for appellants.

James A. Snowden and Kathryn J. Van Balen, of Wolfe, Snowden, Hurd, Ahl, Sitzmann, Tannehill & Hahn, L.L.P., for appellee Rebecca Steinke, M.D.

Mark A. Christensen, Travis W. Tettenborn, and Isaiah J. Frohling, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellee Douglas Boon, M.D.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Freudenberg, JJ., and Miller, District Judge.

Freudenberg, J.

## I. INTRODUCTION

Parents brought a claim for medical malpractice against two doctors involved in the birth and emergency care of their infant son. At trial, the district court excluded expert testimony concerning the standard of care, ruling that the parents failed to establish the expert's familiarity with the standard of care under the locality rule. The district court also excluded expert testimony concerning causation because of a lack of pretrial disclosure and lack of foundation. At the close of the plaintiffs' evidence, the district court directed a verdict in favor of the defendant doctors, finding that the plaintiffs failed to present sufficient evidence for a jury to find in their favor on each element of their claims. On appeal, the plaintiffs argue that the district court abused its discretion by excluding the expert testimony on the standard of care and causation and that a reasonable jury could have found in their favor on both malpractice claims. We affirm.

## II. BACKGROUND

In 2015, Jamie Carson (Carson) went into labor and was admitted to St. Francis Medical Center (St. Francis) in Grand Island, Nebraska. Around 1:30 a.m., a nurse informed Rebecca Steinke, M.D., that the heart rate of the baby, Boston Carson, had dropped to around 90 beats per minute, medical personnel were having trouble keeping the monitor in position to get a good reading, and they wanted Steinke to come to the hospital and evaluate Carson.

Steinke immediately went to the hospital. Steinke was concerned because the heart rate monitor showed Boston's heart rate was too low. Steinke decided to place an internal monitor on Boston's head to get a more consistent reading of Boston's heart rate. To do so, Steinke punctured Carson's amniotic sac, allowing her to manually feel around Boston's head.

As Steinke attempted to place the internal heart rate monitor, she felt Boston's umbilical cord up by his head and

ordered the nurses to immediately summon the surgeon on call for an emergency cesarean delivery (C-section). Steinke kept her hand on Boston's head to keep it from pinching the umbilical cord until Carson was moved to the operating room and the surgeon delivered Boston by C-section. Boston was not moving or breathing after birth. The emergency room physician arrived and was able to resuscitate and intubate Boston after several tries.

Douglas Boon, M.D., then took over Boston's care. Boon provided care and treatment to Boston from shortly after birth until Boston left St. Francis. Boon did not testify to his experience of Boston's treatment.

Carson visited Boston in the neonatal intensive care unit (NICU) several times the next day. On her third visit, Carson observed Boston gasping for air. When Boon visited that night, Carson told him that she believed Boston was dying because he was hardly breathing. Carson then requested to have Boston transferred to a different hospital. Boston was transferred by ambulance to Children's Hospital in Omaha, Nebraska, where he was placed on a breathing machine. Upon his subsequent discharge from the hospital, Boston was prescribed medication for seizures.

Steinke saw Boston after his discharge from the hospital. As part of the care Steinke provided Boston, she created a "problem list," which is a record of a patient's history, including potential problems that the patient may have experienced. The "problem list" included hypoxic ischemic encephalopathy (HIE), or decreased alertness and cell damage due to the lack of oxygen. At trial, Steinke later testified that the inclusion of HIE on the "problem list" did not mean it occurred. Carson testified that as Boston has grown, he was "developmentally delayed," required an individualized education plan at school, took medication to aid in sleeping, and was prone to unpredictable emotional "meltdowns."

Carson and her husband, Brad Carson, brought suit individually and on Boston's behalf, alleging the professional

negligence of Boon and Steinke caused Boston to suffer permanent damage. The case proceeded to trial.

## 1. Expert Testimony

### (a) Dr. Scott Nau

At trial, the Carsons called Dr. Scott Nau to testify as an expert witness to the standard of care required of Boon in his treatment of Boston. At the time of trial, Nau was a board-certified general pediatrician at Mercy Hospital in Cedar Rapids, Iowa. Before that, he worked for 32 years in the NICU at St. Luke's Hospital, also in Cedar Rapids.

Nau testified that he was "familiar with the standard of care for pediatricians" in the NICU, but was familiar with communities the size of Grand Island only "[t]o a degree" and was "guessing" that his current employment at Mercy Hospital "would kind of be a mirror of St. Francis." However, he said that he knew "[St. Francis] provide[s] newborn intensive care and ha[s] ventilated children briefly and babies briefly" but that if St. Francis was "going to prolong ventilation," then the babies "were transferred."

Before Nau could give his opinion on whether Boon deviated from the standard of care, Boon objected to a lack of proper foundation. On voir dire, Nau testified that he was not licensed to practice in Nebraska, had practiced his entire career in Iowa, and had never been to Grand Island. He also testified that at the time of his deposition, he knew nothing about Grand Island, St. Francis, or Boon beyond what was on St. Francis' website and in Boon's deposition. Finally, he testified that he did not do anything to investigate the standard of care for pediatricians practicing at St. Francis in Grand Island and did not discuss the case with any physicians from Nebraska.

The district court sustained Boon's objection and instructed the Carsons' attorney to lay more foundation. When asked whether he knew the standards for treating and caring for pediatric patients in Nebraska, Nau responded that he had

"no reason to think that children in Nebraska would be entitled to a lower level of care than children in Iowa." He further testified that the American Academy of Pediatrics holds all members to the same standards nationwide and that the standard of care for pediatrics is universal across the nation.

Nau confirmed that he had done nothing to verify that the standard of care in Grand Island did not differ from the national standard. He also testified that the practices at Mercy Hospital, where he currently worked, were similar to what he thought was happening at St. Francis, because both are "Level 2" centers. He testified that his understanding was that Mercy Hospital had a neonatologist and neonatal nurse practitioners and St. Francis did not. The district court again sustained Boon's objection but allowed further testimony to establish foundation.

Later in the trial, Boon testified that at St. Francis, "[w]e provide care based on the resources and facilities in Grand Island that are available to us." Nau then retook the stand and agreed that the "standard of care requires providing the appropriate level of care based on the facilities and resources available." He also testified that this was the standard of care he practices in Cedar Rapids. The district court again sustained Boon's objection to Nau's testimony, finding that while both doctors agreed the general standard of care is "doing the best work you can with the resources at hand," there had been "no evidence" that Nau was "familiar with the resources in [Grand Island]" or any "similar locality."

### (b) Dr. David Demarest

The Carsons hired Dr. David Demarest to examine and evaluate Boston for the purposes of testifying at trial. He testified that Boston had significant mental deficits. Boon and Steinke objected to Demarest's answering whether his findings were "consistent with HIE or an anoxic injury at birth," because Demarest had stated in his deposition testimony that he would not offer any opinion on causation. Demarest had

stated in his deposition that he would not be giving a "pediatric neurology opinion as to the exact cause of [Boston's] condition." He further stated that he was not making "conclusions as to etiology" in this case. "Etiology" is "the cause of a disease or abnormal condition."[1] Demarest also stated that he was "not qualified to weigh in on causation in this case." The district court sustained the objection based on a lack of foundation and a lack of disclosure in discovery.

### (c) Dr. Kelly Elmore

The Carsons called Dr. Kelly Elmore to testify as an expert witness concerning the care and treatment provided by Steinke. Elmore testified to her opinion that Steinke's failure to meet the standard of care for physicians delivering babies caused harm to Boston. Specifically, she testified that Steinke should have done a thorough review of the readout from the external heart monitor to get more information about Boston's heart rate from earlier in the night and that puncturing Carson's amniotic sac harmed Boston because it caused his heart rate to decrease and limit oxygen to the brain. Elmore opined that without a doctor immediately available to perform a C-section when Steinke punctured the amniotic sac, "there could have been a significantly bad outcome," and that Steinke made Boston's harm worse "and couldn't fix it."

Elmore also testified that there might have been compression of Boston's umbilical cord prior to Steinke's puncturing Carson's amniotic sac, that Boston may have been "compromised" before Steinke arrived at the hospital, and that she did not know whether Boston suffered neurological injury before Steinke arrived or between cord prolapse and delivery.

When asked if she could say with reasonable medical certainty that Boston would have been "better off" if he had been delivered by C-section immediately when Steinke arrived, Elmore responded that "[c]linically," she could say that Boston "would have been better off." She confirmed

---

[1] Merriam-Webster's Collegiate Dictionary 430 (11th ed. 2020).

that she had a "clinical basis" for her opinion, but not a "scientific basis."

## 2. Directed Verdict and Motion for New Trial

At the close of the Carsons' presentation of evidence, both Boon and Steinke moved for directed verdicts. Viewing all evidence "in the light most favorable to the nonmoving party," the district court granted both motions.

Steinke argued that the Carsons' evidence (1) showed no departure from the standards of care in Grand Island or similar communities and (2) failed to show that the alleged departures from the standard of care proximately caused harm to the Carsons or that there was any causal connection between Steinke's actions and the Carsons' harm. The district court granted Steinke's motion for a directed verdict, finding that any verdict by the jury against Steinke on the element of causation "would be based on speculation rather than on evidence showing a diagnosis within a reasonable degree of medical certainty."

Boon argued that without Nau's testimony, the Carsons presented no evidence to establish the standard of care or that a breach of the standard of care was the proximate cause of the Carsons' injury or damage. The district court agreed and granted Boon's motion for directed verdict.

The Carsons filed a motion for new trial. At a hearing, the Carsons renewed their arguments against the directed verdicts but presented no new evidence. The district court denied the motion for new trial.

The Carsons appeal.

## III. ASSIGNMENTS OF ERROR

The Carsons assign that the district court erred by granting directed verdicts for Boon and Steinke and denying their motion for new trial. Specifically, they assign that the district court should have (1) allowed Nau to testify to the

standard of care for pediatricians in Grand Island and Boon's failure to meet that standard, (2) interpreted Neb. Rev. Stat. § 44-2810 (Reissue 2021) to allow an expert to testify to the standard of care for physicians in "similar" localities, (3) credited testimony in the record that the standard of care for board-certified pediatricians is a national standard, (4) not presumed the standard of care in Grand Island is different from the national standard, and (5) allowed Demarest's testimony that Boston's injuries were "consistent with" injuries caused by lack of oxygen at birth.

## IV. STANDARD OF REVIEW

We review de novo whether the trial court applied the correct legal standards for admitting an expert's testimony, and we review for abuse of discretion how the trial court applied the appropriate standards in deciding whether to admit or exclude an expert's testimony.[2]

An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[3]

A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.[4]

In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its

[2] *McGill Restoration v. Lion Place Condo. Assn.*, 309 Neb. 202, 959 N.W.2d 251 (2021).

[3] *State v. Abligo*, 312 Neb. 74, 978 N.W.2d 42 (2022).

[4] *de Vries v. L & L Custom Builders*, 310 Neb. 543, 968 N.W.2d 64 (2021).

favor and to have the benefit of every inference which can reasonably be deduced from the evidence.[5]

An appellate court reviews a denial of a motion for new trial or, in the alternative, to alter or amend the judgment, for an abuse of discretion.[6]

## V. ANALYSIS

The Carsons argue that the district court erred by excluding Nau's testimony concerning the standard of care applicable to Boon, because he should have been allowed to testify to a national standard of care and the district court failed to consider the reliability factors laid out in *Schafersman v. Agland Coop*.[7] They also argue that the district court erred by excluding Demarest's testimony due to his deposition testimony that he would not be offering any opinions on causation, because an opinion that Boston's condition was consistent with HIE does not go to causation. Finally, they argue the directed verdicts were improper because, considering the testimony of Nau, Demarest, and Elmore, they met their burden on the elements of their malpractice claims against both Boon and Steinke.

[1] We hold that under § 44-2810, a party who seeks to present expert testimony on the standard of care in a medical malpractice case must demonstrate familiarity with the standard of care in the defendant's locality or a similar locality. Additionally, we hold that the district court did not abuse its discretion in determining the Carsons failed to demonstrate Nau's familiarity with the standard of care in Grand Island or a similar locality. We also hold that the district court did not abuse its discretion when it excluded Demarest's testimony

---

[5] *AVG Partners I v. Genesis Health Clubs*, 307 Neb. 47, 948 N.W.2d 212 (2020).

[6] *Id.*

[7] *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

as a causation opinion. Finally, we hold that the district court correctly directed verdicts for Boon and Steinke, because the Carsons presented no admissible expert testimony on the standard of care applicable to Boon and because Elmore's testimony concerning Steinke was too speculative to establish causation.

## 1. Admissibility of Expert Testimony

[2-4] We review de novo whether the trial court applied the correct legal standards for admitting an expert's testimony, and we review for abuse of discretion how the trial court applied the appropriate standards in deciding whether to admit or exclude an expert's testimony.[8] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[9] It is the burden of the proponent of expert testimony to establish the necessary foundation for its admission.[10]

### (a) Not Abuse of Discretion to Exclude Nau's Testimony

[5-7] Expert testimony offered to establish the standard of care in a medical malpractice case is admissible only if its proponent can demonstrate the expert's familiarity with the relevant standard of care in the defendant's community or a similar community.[11] Section 44-2810 defines the general standard of care in medical malpractice cases as "the ordinary and reasonable care, skill, and knowledge ordinarily

---

[8] *McGill Restoration, supra* note 2.

[9] *Abligo, supra* note 3.

[10] *State v. Casillas*, 279 Neb. 820, 782 N.W.2d 882 (2010).

[11] See, § 44-2810; *Green v. Box Butte General Hosp.*, 284 Neb. 243, 818 N.W.2d 589 (2012); *Gourley v. Nebraska Methodist Health Sys.*, 265 Neb. 918, 663 N.W.2d 43 (2003); *Capps v. Manhart*, 236 Neb. 16, 458 N.W.2d 742 (1990).

possessed and used under like circumstances by members of his profession engaged in a similar practice in his or in similar localities." It also provides that to determine what constitutes such ordinary and reasonable care, skill, and diligence in a particular case, the test is "that which health care providers, in the same community or in similar communities and engaged in the same or similar lines of work, would ordinarily exercise and devote to the benefit of their patients under like circumstances."[12]

[8-10] Expert testimony concerning this standard of care should not be received if it appears the witness is not in possession of such facts as will enable him or her to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture.[13] In general, expert testimony is admissible only "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ."[14] Where an expert's opinion is mere speculation or conjecture, it is irrelevant and cannot assist the trier of fact.[15]

We have held that an expert's affidavit was not admissible, because it did not affirmatively state that the expert was familiar with the standard of care in the defendant's county or similar communities.[16] In *Green v. Box Butte General Hosp.*,[17] an expert submitted an affidavit that said she received a doctorate in nursing from the University of Nebraska Medical Center College of Nursing in Omaha and taught there for decades. The expert never stated in her affidavit or otherwise that she was familiar with the standard of care in

---

[12] § 44-2810.

[13] See *Gourley, supra* note 11.

[14] Neb. Rev. Stat. § 27-702 (Reissue 2016).

[15] *Gourley, supra* note 11.

[16] *Green, supra* note 11.

[17] *Id.*

Box Butte County, where the alleged malpractice occurred.[18] Nevertheless, she opined that the defendant hospital had violated the standard of care in various ways.[19] We held that evidence of the expert's experience and education without any evidence of familiarity with the relevant or similar locality was insufficient "to affirmatively demonstrate that she was competent to testify as to the standard of care."[20]

In contrast, in *Capps v. Manhart*,[21] we held that an expert who practiced in Merrillville, Indiana, could testify to the standard of care in Omaha, because he testified he was familiar with the standard of practice applicable to dentists in Omaha and similar communities. The trial court had overruled plaintiff's objection that the expert had failed to show a familiarity with the standards in Omaha or similar communities. We affirmed, holding that evidence that the expert had never practiced in the defendant's locality goes to the weight of the evidence but does not keep the expert from testifying to the standard of care in the relevant locality, if the expert testifies that he or she is nevertheless familiar with the standard of care in the same or similar locality.[22] Because the expert testified that he was familiar with the standard of care applicable to dentists in Omaha, he was competent to testify.[23]

[11-13] Section 44-2810 does not define "similar community," but we interpret this term in light of the general purpose of § 44-2810 to define the standard of care to which a defendant is to be held in medical malpractice cases.[24] This

---

[18] *Id.*

[19] *Id.*

[20] *Id*. at 255, 818 N.W.2d at 599.

[21] *Capps, supra* note 11.

[22] *Id.*

[23] *Id.*

[24] See *Porter v. Knife River, Inc.*, 310 Neb. 946, 970 N.W.2d 104 (2022).

purpose would not be served if the similarity of two communities could be determined by considering characteristics that are irrelevant to the level of medical care that is to be expected. Instead, we agree with those jurisdictions that consider medically relevant factors, including available facilities, personnel, equipment, and practices, to determine whether two communities are similar under their medical malpractice statutes.[25]

For example, the Iowa Supreme Court, in *Estate of Hagedorn*,[26] recognized that "the availability of medical knowledge has become more universal." Nevertheless, it upheld its statutory locality rule, explaining that "the locality rule has retained validity in its other aspects," including the "facilities, personnel, services, and equipment reasonably available to a physician."[27] The parties' experts in *Estate of Hagedorn* had given conflicting testimony on when the defendant should have summoned the surgical team to prepare for an emergency C-section.[28] The defendants' experts argued that it was not reasonable to do so sooner because of limited medical personnel available in the community.[29] Because the availability of resources was relevant to the standard of care, the court held that the trial court properly instructed the jury on the locality rule.[30]

The Arkansas Supreme Court has likewise explained that the "similarity of communities should depend not on

---

[25] See, *Robbins v. Footer*, 553 F.2d 123 (D.C. Cir. 1977); *Priest v. Lindig*, 583 P.2d 173 (Alaska 1978); *White v. Mitchell*, 263 Ark. 787, 568 S.W.2d 216 (1978); *Estate of Hagedorn*, 690 N.W.2d 84 (Iowa 2004); *Chapel v. Allison*, 241 Mont. 83, 785 P.2d 204 (1990); *Purvis v. Moses H. Cone Memorial Hosp.*, 175 N.C. App. 474, 624 S.E.2d 380 (2006).

[26] *Estate of Hagedorn, supra* note 25, 690 N.W.2d at 89.

[27] *Id*.

[28] *Estate of Hagedorn, supra* note 25.

[29] *Id*.

[30] *Id*.

population or area in a medical malpractice case, but rather upon their similarity from the standpoint of medical facilities, practices and advantages."[31] In *White v. Mitchell*,[32] for example, a trial court admitted testimony from an expert who was unfamiliar with the practice of medicine in the defendant's locality but testified that he had consulted in hospitals in towns of a similar size to the defendant's town, had practiced at a hospital similar in size and available medical personnel to the defendant's hospital, and had consulted with physicians from rural communities like the defendant's community. The Arkansas Supreme Court affirmed the trial court's decision, concluding that given the expert's "vast medical practice" and "extensive association" with medical communities comparable to the defendant's, the trial court did not abuse its discretion by admitting the evidence.[33]

[14,15] In sum, the burden is on the proponent of standard-of-care testimony to demonstrate that the expert is familiar with the customary practice among physicians in the defendant's community or a community that is similar in terms of available resources, facilities, personnel, practices, and other medically relevant factors.[34] If a party cannot demonstrate his or her expert's familiarity with such standard of care, then the expert's testimony is properly excluded.[35]

[16,17] We decline the Carsons' request to interpret § 44-2810 to allow an expert unfamiliar with the defendant's community or similar community to testify to a national standard of care. We cannot eliminate the locality rule explicitly

---

[31] *Gambill v. Stroud*, 258 Ark. 766, 770, 531 S.W.2d 945, 948 (1976).

[32] *White, supra* note 25.

[33] *Id.* at 799, 568 S.W.2d at 221.

[34] See, *Robbins, supra* note 25; *Priest, supra* note 25; *White, supra* note 25; *Estate of Hagedorn, supra* note 25; *Chapel, supra* note 25; *Purvis, supra* note 25.

[35] See, *Green, supra* note 11; *Gourley, supra* note 11; *Capps, supra* note 11.

required by the statute.[36] Although we have recognized that "medical standards of care and skill are becoming national, rather than local or regional,"[37] "[w]e cannot depart from the customary standard of care on policy grounds, even if is subject to criticism, because the standard of care is defined by statute and public policy is declared by the Legislature."[38] Additionally, we decline to impose a burden-shifting framework on § 44-2810. The Legislature did not put a burden-shifting framework into the statute, and we cannot read into a statute something that is not there.[39]

[18] Our holding does not mean that expert testimony concerning a national standard of care is always inadmissible.[40] Expert testimony establishing a national standard of care is admissible if the expert can establish that the national standard of care does not differ in the defendant's community or a similar community.[41] As the Tennessee Supreme Court has explained, "expert medical testimony regarding a broader regional standard or a national standard should not be barred, but should be considered as an element of the expert witness' knowledge of the standard of care in the same or similar community."[42] If testimony regarding a national standard of care is "coupled with the expert's explanation of why the national standard applies under the circumstances," then it is "permissible and pertinent to support the expert's opinion on the standard of care."[43]

---

[36] See, *Hemsley v. Langdon*, 299 Neb. 464, 909 N.W.2d 59 (2018); *Murray v. UNMC Physicians*, 282 Neb. 260, 806 N.W.2d 118 (2011).

[37] *Kortus v. Jensen*, 195 Neb. 261, 269, 237 N.W.2d 845, 850 (1976).

[38] *Murray, supra* note 36, 282 Neb. at 271, 806 N.W.2d at 126.

[39] See *State v. Brunsen*, 311 Neb. 368, 972 N.W.2d 405 (2022).

[40] See, *Walls v. Shreck*, 265 Neb. 683, 658 N.W.2d 686 (2003); *Shipley v. Williams*, 350 S.W.3d 527 (Tenn. 2011).

[41] See, *White, supra* note 25; *Shipley, supra* note 40.

[42] *Shipley, supra* note 40, 350 S.W.3d at 553.

[43] *Id.*

Applying these principles, the district court did not abuse its discretion by concluding that the Carsons failed to establish Nau's familiarity with the standard of care in Grand Island or that Cedar Rapids is similar to Grand Island in terms of available medical facilities, personnel, services, or practices.

Nau initially testified: "I know [doctors in Grand Island] provide newborn intensive care and have ventilated . . . babies briefly, but if they were going to prolong ventilation, [the babies] were transferred." However, he admitted that he lacked foundation for this statement, because he said he knew nothing about Grand Island and had done nothing to investigate the standard of care in Grand Island. Given this testimony, it was not an abuse of discretion for the district court to conclude that the Carsons had failed to establish Nau's direct familiarity with the standard of care in Grand Island.

Additionally, the district court did not abuse its discretion by concluding that the Carsons failed to establish that he was familiar with the standard of care in a "similar" locality. Nau testified that he was familiar only with communities that are similar to the Grand Island community in "size, population, and education" "[t]o a degree" and that he was "guessing" his current place of employment "would kind of be a mirror of St. Francis." These statements alone fall far below the "extensive association" with similar communities found in *White*.

Nau further testified: "[M]y take of what I have seen at the hospital that I practiced at for the past seven years is similar to what I think was happening at St. Francis," because "[b]oth are Level 2 centers." However, the district court did not abuse its discretion by deciding that the hospitals' status as "Level 2 centers" is not enough to establish the similarity of the two communities in this case. Both Nau and Boon agreed that the actual standard of care in this case depended on the resources and facilities available. Nau did not explain what it means to be a "Level 2" center or whether it relates to the available resources and facilities. In fact, he explained that

while both St. Francis in Grand Island and Mercy Hospital in Cedar Rapids had "Level 2" nurseries, his hospital had neonatologists and neonatal nurses. He also explained that unlike "Level 2" nurseries, "Level 3" nurseries "often have" neonatologists, are "supposed to have" pediatric specialists, and have the "ability to do EEGs [and] echocardiograms." Additionally, Nau testified that St. Luke's Hospital in Cedar Rapids, where newborns from his hospital would be transferred, was "not quite a real Level 3," because it did not have all the necessary pediatric specialists. Nau's testimony shows that resources can differ within a given level rating.

Finally, Nau testified that the standard of care in Cedar Rapids would be to transfer a newborn from Mercy Hospital to a higher level NICU at St. Luke's Hospital, both of which are in Cedar Rapids. There was no testimony that there was a higher level of nursery a comparable distance away from St. Francis to which Boston could have been transferred. Instead, all we know is that Boston was eventually transferred to Children's Hospital in Omaha.

Given the lack of testimony establishing the available resources, personnel, and facilities in both Grand Island and Cedar Rapids, the district court did not abuse its discretion by determining that the Carsons failed to show that Grand Island and Cedar Rapids are similar.

[19,20] Because the district court excluded Nau's testimony due to a lack of foundation, we disagree with the Carsons' argument that the district court was required to analyze the admissibility of Nau's testimony under the factors provided in *Schafersman v. Agland Coop.*[44] In *Schafersman*, we held that a trial court acts as gatekeeper to ensure the reliability of an expert's opinion, and we laid out several factors to assess the expert's methodology and reasoning.[45] We have

---

[44] *Schafersman, supra* note 7. See *Hemsley, supra* note 36.

[45] *Schafersman, supra* note 7.

applied the *Schafersman* factors where expert testimony concerning the standard of care was challenged on the basis of scientific unreliability.[46] We have not applied the *Schafersman* factors when deciding whether expert testimony was inadmissible because of a lack of foundation.[47] Boon challenged Nau's testimony based on a lack of foundation establishing his familiarity with the standard of care, not because of any unreliability in Nau's reasoning or methodology. Therefore, the district court was not required to exercise the gatekeeping function from *Schafersman*.

### (b) Demarest

[21,22] Likewise, we find no merit to the Carsons' argument that the district court abused its discretion by excluding Demarest's testimony that Boston's injuries were "consistent with HIE or an anoxic injury," due to lack of disclosure in discovery and lack of foundation. An important aspect of each party's trial preparation is the discovery of the opinions that the opposing party's expert witness will state at trial.[48] Pretrial discovery enables litigants to prepare for trial without the element of an opponent's tactical surprise.[49]

Accordingly, in *Paulk v. Central Lab. Assocs.*,[50] we held that a trial court erred by allowing an expert to testify to an opinion that he failed to disclose in a pretrial deposition. A woman brought a malpractice and wrongful death action

---

[46] See *Hemsley, supra* note 36.

[47] See, *Bank v. Mickels*, 302 Neb. 1009, 926 N.W.2d 97 (2019); *Hemsley, supra* note 36; *Rankin v. Stetson*, 275 Neb. 775, 749 N.W.2d 460 (2008); *Zimmerman v. Powell*, 268 Neb. 422, 684 N.W.2d 1 (2004).

[48] *Paulk v. Central Lab. Assocs.*, 262 Neb. 838, 636 N.W.2d 170 (2001). Accord *Norquay v. Union Pacific Railroad*, 225 Neb. 527, 407 N.W.2d 146 (1987).

[49] *Paulk, supra* note 48.

[50] *Id.*

against two doctors for failing to detect and diagnose her deceased husband's malignant melanoma.[51] The doctors deposed the woman's medical expert in preparation for trial,[52] and the opposing party asked the expert to disclose all of his anticipated testimony concerning the tissue samples.[53] At trial, the expert testified to his opinion that malignant melanoma cells were detectable in early samples, an opinion he did not disclose in the deposition.[54] The opposing party moved for a mistrial, which the trial court denied.[55] We held on appeal that the district court abused its discretion in denying the mistrial, because whether the melanoma was detectable was a key issue in the case and, therefore, the expert's undisclosed testimony constituted an unfair surprise.[56]

Similarly, allowing Demarest to testify that Boston's condition was consistent with HIE or an anoxic injury would have been an unfair surprise to Boon and Steinke. Demarest not only failed to disclose his opinion pretrial, but affirmatively stated that he would not be giving any opinion as to the cause of Boston's condition. Demarest also stated he was not competent to give such opinions. It was not an abuse of discretion for the district court to exclude Demarest's opinion for lack of disclosure and lack of foundation.

We disagree with the Carsons' argument that Demarest's opinion was not an opinion as to causation. The Carsons rely on case law wherein we have held an opinion that an injury or condition is "consistent with" a particular cause is not sufficient to establish causation in a medical malpractice case.[57]

---

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] See *Baer v. Schaap*, 171 Neb. 347, 106 N.W.2d 468 (1960).

However, just because such an opinion is insufficient to establish causation does not mean that it is irrelevant to causation. Whether Boston's condition at the time of trial was caused by HIE or other anoxic injury at birth was a key issue in the Carsons' claim against Steinke. It was reasonable for the district court to conclude that Demarest's opinion was offered to show that causal link. Alternatively, if his opinion was not offered to show causation, then it was not relevant to any issue in this case and was still inadmissible.[58]

## 2. Directed Verdicts

Having determined that the district court did not err in excluding the testimony of Nau and Demarest, we hold that the district court did not err in granting Boon's and Steinke's motions for directed verdict.

[23,24] A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.[59] In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence.[60]

[25,26] To make a prima facie case for medical malpractice, a plaintiff must show (1) the applicable standard of care, (2) that the defendant(s) deviated from that standard

---

[58] See, Neb. Rev. Stat. § 27-402 (Reissue 2016); *State v. Said*, 306 Neb. 314, 945 N.W.2d 152 (2020).

[59] *de Vries, supra* note 4.

[60] *AVG Partners I, supra* note 5.

of care, and (3) that this deviation was the proximate cause of the plaintiff's harm.[61] Except in circumstances not applicable here, expert testimony is required on each element.[62] Because Nau's testimony was properly excluded, the Carsons presented no expert testimony on any of the three elements to make a prima facie case against Boon. Accordingly, the district court correctly directed a verdict in favor of Boon.

[27-29] The district court also correctly directed a verdict in favor of Steinke, because the Carsons failed to present evidence against Steinke sufficient to allow a reasonable jury to find in their favor on the issue of causation. To satisfy the burden to establish each element of medical malpractice by expert testimony, the expert's opinion must be sufficiently definite and relevant to provide a basis for the fact finder's determination of an issue or question.[63] We have explained that "'[m]edical expert testimony regarding causation based upon possibility or speculation is insufficient; it must be stated as being at least "probable," in other words, more likely than not.'"[64] Although expert medical testimony need not be couched in the magic words "reasonable medical certainty" or "reasonable probability," it must be sufficient as examined in its entirety to establish the crucial causal link between the plaintiff's injuries and the defendant's negligence.[65]

[30] Accordingly, we have held that even when an opinion purports to rise to a reasonable degree of medical certainty or probability, it does not satisfy the burden of proof on causation if the outcome is not sufficiently definite.[66] For

---

[61] *Thone v. Regional West Med. Ctr.*, 275 Neb. 238, 745 N.W.2d 898 (2008).

[62] See, *Green, supra* note 11; *Thone, supra* note 61.

[63] *Thone, supra* note 61.

[64] *Lewison v. Renner*, 298 Neb. 654, 663-64, 905 N.W.2d 540, 548 (2018).

[65] *Lewison, supra* note 64.

[66] See, *Richardson v. Children's Hosp.*, 280 Neb. 396, 787 N.W.2d 235 (2010); *Rankin, supra* note 47.

example, in *Rankin v. Stetson*,[67] an expert testified that it was more likely than not that a patient would have had a better prognosis had the defendant not breached the standard of care. We held that statements relating to a "'chance of avoiding permanent . . . injury'" or a "'better prognosis'" "do not establish the certainty of proof that is required."[68] However, the expert also testified that the patient had neurological deficits as a result of spinal cord compression and that the patient "would have had a better outcome" if she had received early surgical decompression.[69] We held that this was sufficiently certain to establish causation.[70]

The district court admitted Elmore's testimony without objection. On review from a directed verdict, we must give the Carsons the benefit of every reasonable inference which may be deduced from this testimony.[71] But examined in its entirety and given the benefit of every reasonable inference, Elmore's testimony was too speculative and insufficiently definite to support a finding that Steinke's negligence caused Boston harm. Elmore first testified to her opinion that when Steinke punctured Carson's amniotic sac, "there *could have* been a significantly bad outcome" and that Steinke could not fix it. (Emphasis supplied.) This is language of possibility, not probability.

Elmore also testified that Boston's harm was due to a lack of oxygen to his brain because of a low heart rate and that Steinke made Boston's heart rate worse and could not "fix it." But she did not state to what degree of medical certainty she could state that opinion. And she did not say whether "worse" referred to some ultimate harm or simply a danger of ultimate harm.

---

[67] *Rankin, supra* note 47.

[68] *Id*. at 787, 749 N.W.2d at 469.

[69] *Id*.

[70] *Id*.

[71] See *AVG Partners I, supra* note 5.

Elmore testified that Boston would have been "better off" if he had been delivered when Steinke first arrived, but she avoided answering whether she could state this opinion with a reasonable degree of medical certainty. Instead, she stated that although she did not have a scientific basis for her opinion, "[c]linically," she could say that Boston would have been better off.

On cross-examination, Elmore affirmed that she could not say whether Boston suffered neurological injury before Steinke arrived, because Boston's heart rate was potentially already compromised. And when asked whether she had any opinion as to whether neurological injury occurred between Steinke's intervention and the C-section, Elmore admitted that "it could have, I do not know." These answers show that even if Elmore was certain that Steinke caused Boston's heart rate to drop, she can only speculate about whether Boston suffered any harm as a result.

Even assuming that Elmore's clinical basis meets the requisite degree of medical certainty, an opinion that Boston would have been "better off" is not sufficiently definite, because this opinion was never connected to any actual injury to Boston. Unlike the expert in *Rankin*, Elmore never said what injury Steinke made worse or how Boston would have been "better off." Phrases like "made it worse" and "better off" are not sufficiently certain to establish causation without testimony of what harm Boston experienced. Demarest testified that Boston had significant mental deficits, and Carson testified to Boston's developmental, educational, and behavioral issues, but there was no testimony that these conditions were caused by Steinke's alleged negligence. Because Elmore refused to state that her opinions were made to a reasonable degree of certainty, admitted that she could not say whether Boston suffered any harm before or after Steinke's alleged negligence, and failed to identify any harm that Boston suffered, her opinions as to causation are insufficiently definite to be

relevant and could not support a jury finding for the Carsons on the issue of causation.

## VI. CONCLUSION

The district court did not abuse its discretion by excluding the testimony of Nau and Demarest. The district court also correctly directed verdicts for Boon and Steinke, because the Carsons failed to present sufficient evidence to allow a reasonable jury to make findings in their favor on each element of their malpractice claims.

Affirmed.

Papik, J., not participating.