Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/05/2023 09:07 AM CST

- 410 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

Adam R. Herink, appellee and cross-appellant,
v. Bluestem Energy Solutions, LLC,
appellant and cross-appellee.

___ N.W.2d ___

Filed November 28, 2023.    No. A-22-892.

1. **Directed Verdict.** A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.

2. **Directed Verdict: Appeal and Error.** In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence.

3. **Summary Judgment: Appeal and Error.** An appellate court reviews a district court's grant of summary judgment de novo.

4. ____: ____. An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law. In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.

5. **Prejudgment Interest: Appeal and Error.** On appeal, awards of prejudgment interest are reviewed de novo.

6. **Directed Verdict: Waiver: Appeal and Error.** A defendant who moves for a directed verdict at the close of the plaintiff's evidence and, upon the overruling of such motion, proceeds with trial and introduces evidence, waives any error in the ruling on the motion.

- 411 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

7. **Contracts.** A contract must receive a reasonable construction and must be construed as a whole.

8. \_\_\_\_. If possible, effect must be given to every part of a contract.

9. **Contracts: Intent.** A contract which is written in clear and unambiguous language is not subject to interpretation or construction; rather, the intent of the parties must be determined from the contents of the contract, and the contract must be enforced according to its terms.

10. **Contracts: Prejudgment Interest.** Neb. Rev. Stat. § 45-104 (Reissue 2021) authorizes prejudgment interest on four categories of contract-based claims without regard to whether the claim is liquidated or unliquidated.

11. **Judgments: Interest: Prejudgment Interest: Time.** Prejudgment interest under Neb. Rev. Stat. § 45-104 (Reissue 2021) ends, and postjudgment interest begins, on the date of entry of judgment.

Appeal from the District Court for Douglas County: Timothy P. Burns, Judge. Affirmed.

William F. Hargens, Patrick D. Pepper, Lauren R. Goodman, and Donald R. Rison, of McGrath, North, Mullin & Kratz, P.C., L.L.O., for appellant.

David A. Domina, of Domina Law Group, P.C., L.L.O., for appellee.

Riedmann, Bishop, and Arterburn, Judges.

Bishop, Judge.

## I. INTRODUCTION

Adam R. Herink brought a breach of contract action against Bluestem Energy Solutions, LLC (Bluestem), regarding Bluestem's determination of the purchase price for Herink's interest in Bluestem at the time of his termination of employment. In its counterclaim, Bluestem sought a declaratory judgment and an order for specific performance regarding its determined purchase price of $410,350. During the jury trial, Bluestem motioned for a directed verdict, which was denied. The jury ultimately found Bluestem was in breach of contract and determined that the fair market value of Herink's interest in Bluestem was $2 million. The Douglas County

- 412 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

District Court entered judgment on the verdict. The court subsequently granted summary judgment in favor of Herink on Bluestem's counterclaim. The court also awarded Herink costs, prejudgment interest, and postjudgment interest.

On appeal, Bluestem challenges the district court's decision to deny its motion for a directed verdict on the breach of contract claim and the court's grant of summary judgment in favor of Herink on Bluestem's counterclaim. On cross-appeal, Herink challenges the court's determination of the prejudgment and postjudgment interest rates. We affirm.

## II. BACKGROUND

### 1. Procedural Background

Herink was named vice president of Bluestem in December 2015. He owned 12,150 membership units (11.9 percent) of Bluestem at the time he received a letter dated March 26, 2020, notifying him that his employment with Bluestem was being terminated, without cause, effective April 25. Pursuant to Bluestem's "Second Amended and Restated Operating Agreement" (the Operating Agreement), upon termination of Herink's employment, with or without cause, Herink had to sell and Bluestem had to buy all of Herink's membership units at a "price per Unit equal to the fair market value per Unit as determined by the Manager in his sole discretion, exercised in a commercially reasonable manner." Bluestem's manager, Jon Crane (Crane), determined the aggregate purchase price of Herink's membership units to be $410,350 and tendered that amount to Herink in the form of a promissory note, as allowed under the Operating Agreement. The parties stipulated that Bluestem attempted performance under the promissory note in accordance with its terms and that Herink declined them. Herink believed that Bluestem was obligated to pay him more for his membership units than the amount set forth in the promissory note.

On May 19, 2020, Herink filed a complaint against Bluestem for breach of contract, alleging that he was denied a fair

- 413 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

valuation of his ownership interests in Bluestem. Herink sought "judgment for the commercially reasonable and fair market value of his Bluestem membership Units," prejudgment and postjudgment interest, and costs.

On June 19, 2020, Bluestem filed a motion to dismiss for failure to state a claim upon which relief may be granted, but that motion was overruled on July 30. The district court found that Herink alleged sufficient facts to allege a breach of contract claim. The court stated that "the gravamen of Herink's complaint is that Bluestem did not comply with the methodology agreed to by the parties because the determination of the purchase price of Herink's units was not done 'in a commercially reasonable manner.'"

In its amended answer and counterclaim filed on June 23, 2021, Bluestem denied that it breached its contract with Herink. Bluestem sought a declaratory judgment and order of specific performance against Herink (1) determining that Bluestem had fully complied with the Operating Agreement and (2) directing Herink to accept the sum of $410,350 for his membership units.

## 2. Jury Trial

A jury trial was held on October 31 through November 3, 2022. Herink testified in his own behalf, and he called several other witnesses, including an expert witness to testify about Bluestem and the value of Herink's membership units. After Herink rested his case, Bluestem made an oral motion for a directed verdict, which was overruled. After Bluestem called its own expert witness to testify and rested its case, it renewed its motion for a directed verdict, which was again overruled. We summarize the relevant evidence.

### (a) Bluestem's Background

In 2008, Herink began working for Boyd Jones Construction in a "business-development type role." Boyd Jones Construction was owned by Crane. Crane began exploring alternative energy as a new market for the company.

- 414 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

Herink worked with Crane to develop a renewable energy project for the company, and the company ultimately built, owned, and operated a wind turbine project in Springview, Nebraska. Between 2012 and 2015, Herink helped to develop two additional wind turbine projects in Nebraska.

In 2012, Crane and his wife started a renewable energy company separate from Boyd Jones Construction, and that renewable energy company ultimately became known as Bluestem at the end of 2015. Herink was both an employee of and an investor in Bluestem. Pursuant to agreements entered into on December 24, 2015, Crane was named president of Bluestem and Herink was named vice president. Herink purchased 10,000 (10 percent) of the membership units of Bluestem, with options to purchase additional units in the future. He exercised his purchase option in 2016, purchasing an additional 2,150 units. As an employee of Bluestem, Herink was paid $125,000 per year until the end of 2018, when his annual salary was increased to $300,000.

Herink testified that Bluestem put together a team of senior consultants (former utility executives) and a sales team, "getting ready to go for growth," and traveled to conferences and built a database of potential customers around the country. Herink testified, "Reception was great"; utilities "wanted to get some sort of low-carbon energy." Bluestem initially focused on wind energy, completing seven such projects in Nebraska, and then started focusing more on solar energy. By late 2018 or in 2019, Bluestem began its first solar energy project (in Illinois) and then its first solar battery storage project, using a Tesla battery pack (in Burt County, Nebraska). Bluestem was the developer and owner of all its projects, and it entered long-term, 25- to 30-year, revenue contracts with utilities; Bluestem used Boyd Jones Construction for all construction and some of the maintenance on the projects. Bluestem also had other projects in development, including some for which it had land lease arrangements or ground holes dug (the holes allowed a "safe harbor to secure the tax credits," making a

- 415 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

project more valuable). However, Crane testified that some of those projects in development were either "mired down in litigation," "completely dead," or in the bidding process.

Herink testified that at the end of 2019, Bluestem was "continuing growth and picking up customers on a consistent basis" and was having conversations with potential customers in numerous different states. However, another Bluestem executive testified that 2019 and the early portion of 2020 were "years of struggle." And Crane testified that in November 2019, he met with Herink "[b]ecause we had to get the horse out of the ditch, as they say. We had lost momentum, we'd lost people, and we had to do something, or the future for Bluestem was not very bright." Crane said that part of the problem was that Bluestem was not getting enough projects "across the finish line" fast enough. In his testimony, Herink agreed that it can take years to develop a project and that it might not turn into an actual, operating project; "[t]hat happens with all renewable energy companies." He explained that developing a project means Bluestem was "contracted to develop a project, to put together the pieces so they could present the final project and price to the customer, but there was a contract," a development services agreement; the customer did not have to go through with the project.

### (b) Herink's Employment Terminated

Herink received a letter dated March 26, 2020, informing him that Bluestem was exercising its right to terminate his employment without cause and that the termination was effective April 25. Pursuant to § 7.03(a) of the Operating Agreement,

> [u]pon the occurrence of a Mandatory Operative Event [including termination of employment for any reason, with or without cause,] the Company shall pay the Member a purchase price per Unit equal to the fair market value per Unit as determined by the Manager in his sole discretion, exercised in a commercially reasonable manner.

- 416 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

At the time of his employment's termination, Herink owned 12,150 Bluestem membership units. In the termination letter, Crane stated that "as Manager of the Company," he had determined the fair market value and "the aggregate purchase price for all of [Herink's] 12,150 Units is . . . an amount equal to $ 410,350." In determining that value, Crane relied upon a business valuation generated by his brother, James Crane (Jamie), who was the director of finance and compliance for Bluestem. Bluestem tendered that amount to Herink in the form of a promissory note, as allowed under the Operating Agreement. The parties stipulated that Bluestem attempted performance under the promissory note in accordance with its terms and that Herink declined them. Herink believed that Bluestem was obligated to pay him more for his membership units than the amount set forth in the promissory note.

### (c) Herink's Testimony of Valuation

Herink testified that he knew the value of his units "was a heck of a lot higher than what was put in front of [him]." The company had occasionally been valued, and Herink had the benefit of that information "[i]n [his] head"; he also had the benefit of his experience in the market and what was going on in the industry. He believed that the company was "worth hundreds of millions of dollars" and that the value of his interest in the company was more than $10 million; he later said $25 million.

Additionally, when being questioned about a loan application he made and problems with one of his tax returns, Herink testified, "When Bluestem closed me out of the company, they filed their tax return to say they paid me $2 million." When asked how much he got, Herink replied, "Zero. But to the IRS, it looks like I owed 5-, $600,000 in taxes." When asked if he was referring to an Internal Revenue Service (IRS) schedule K-1, Herink replied, "Yes," his "2020 K-1." He said, "The K-1 closes me out of the [capital] account and, yes, the way the IRS reads it, I was paid . . . around $2 million."

- 417 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

### (d) Crane's and Jamie's
### Testimony of Valuation

Crane's position was that Bluestem tendered an appropriate purchase price to Herink under the terms of the Operating Agreement. When asked what he did to fulfill his role under § 7.03(a) of the Operating Agreement to make that valuation determination, Crane replied, "I asked Jamie . . . to do a business valuation and I told him to include, in addition to the seven operating projects we had, the two other projects we were working on" in Illinois and Burt County. These projects "were either operating . . . or I felt they had a high likelihood of success in the near future and . . . they were projects that had been started and developed while [Herink] was with Bluestem." Crane did not tell Jamie that he was valuing Herink's interest, because he "didn't think it was necessary." Crane told Jamie to "value the company at this point in time using a fair value method." Crane "presumed" Jamie would use a discounted cashflow method.

When asked why he picked Jamie to do the valuation, Crane replied:

> Because I thought he was very qualified, in my judgment, to do it. He had generated all the financial models for all the projects that were up and running, and worked with — been vetted by third party tax equity investors and bankers and accountants and so he knew better than anyone.

Crane took Jamie's valuation, "did the math, came up with the [amount per] unit, and then . . . added some," "roughly $50,000," because "we had worked together a long time and [Herink] and I really were the guys that started this"; "it's so hard to let someone go and, and I just wanted to give him extra money." The aggregate purchase price, as set forth in the termination letter, was $410,350.

Jamie testified that he was the director of finance and compliance for Bluestem. He had an undergraduate degree in accounting and business administration, as well as an "MBA";

- 418 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

Jamie was not a certified public accountant. He stated his primary duties for Bluestem, where he had worked for "[a]bout 5 years," included creating financial models for projects and compliance reporting for operating projects. Jamie did an updated valuation model for Bluestem dated March 25, 2020; he included the nine projects he was directed by Crane to include in the valuation. Jamie agreed that there were probably other projects in development at the time, but stated that neither they nor nonoperating assets (e.g., solar panels earmarked for specific projects already included in the analysis) were included. Jamie did a discounted cashflow analysis and used a 10-percent discount rate, and he subtracted the debt outstanding on the projects. Jamie did not research the appropriate discount rates. According to Jamie, the discount rate used was "based on discussions with [Crane] as well as based on our interest rates that current investors and potential investors were willing to charge us" for a money loan. Jamie said the March 2020 valuation model was representative of the type of modeling he did on a regular basis in his position at Bluestem; the corresponding types of models "would have been reviewed, vetted, and approved by all the financial partners involved in the project, so our bank, our tax equity investors."

### (e) Herink's Expert

John Agogliati III works for a valuation firm that has offices in several cities across the United States. Agogliati testified that he specializes in business valuation, "but the firm itself really covers a spectrum of valuation assignment from real estate, machinery and equipment" and has "a specialized infrastructure in the renewable sector that focuses on wind and solar projects as well." Agogliati has "two of the highest" certifications or credentials in the valuation industry. He has "a CFA, chartered financial analyst," and "an ASA[,] which is accredited senior appraiser" in business valuation.

- 419 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

Agogliati testified regarding two different functions he performed for Herink's case: first, a critique of Jamie's analysis, and second, a full valuation of Bluestem and of Herink's interest in Bluestem ("about 11.78 percent") as of March 26, 2020.

### (i) Agogliati's Critique of
### Jamie's Analysis

First, Agogliati reviewed Jamie's analysis that was used by Crane to determine whether it was done in a commercially reasonable manner; "It was not." Agogliati explained that there are three different approaches to value any asset: cost, market, and income. He said that Jamie "used an income approach and the method within that is called a discounted cash flow" and that Jamie "didn't even consider any other approaches." However, Agogliati agreed that a discounted cashflow methodology was a commonly accepted valuation method.

When Agogliati went through Jamie's analysis, Agogliati "noted a number of things" that he "felt didn't make it in accordance with standard valuation procedure," the main points being the lack of independence (Jamie was Crane's brother and a Bluestem employee); the lack of consideration of future projects (Bluestem was an ongoing business); the determination of the discount rate (too high in Agogliati's opinion, which was that it should have been 9.5 percent); and the subtraction of future debt (something Agogliati said "you don't typically do . . . as of a valuation date for a number of reasons"). Agogliati agreed that his inclusion of future projects was the biggest difference between his valuation and Jamie's analysis, but specified that the inclusion of nonoperating assets was another difference.

In his critique of Jamie's valuation, Agogliati was not determining the fair market value. Rather, Agogliati "showed corrections to show the impact of the errors [he] found in Jamie's approach" because Jamie's analysis "was not commercially reasonable"; the calculated impact of the errors was a range of approximately $1.7 million to $3 million for Herink's interest.

- 420 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

### (ii) Agogliati's Full Valuation

Second, Agogliati performed a full valuation of Bluestem and of Herink's interest in Bluestem, and he testified as to how he did that valuation. In his full valuation, Agogliati ultimately determined that Herink's 12,150 membership units were worth a total of approximately $7.06 million to $10.08 million. When asked if the "fair market value commercially reasonably determined would be somewhere between the top and bottom end of that range," Agogliati replied, "That's correct." On cross-examination, when asked if he attempted to incorporate into his valuation any discretion by Bluestem's manager, Agogliati replied, "I don't even know how you would do that."

### (f) Bluestem's Expert

James Krillenberger testified that he is the managing member of a company that does business valuations. Krillenberger, like Agogliati, has a "CFA" designation and an accredited senior appraiser designation. Krillenberger estimated that he had done over 1,500 business valuations, including valuations of energy companies, over the course of his career. He stated, "I valued renewable energy companies, I valued utilities that have coal generation plants and natural gas generation plants."

Krillenberger testified that he was asked three questions in his work on this case: "One is what's the fair market value of a 12,000-plus unit interest in Bluestem"; Krillenberger opined that the fair market value of Herink's interest as of March 26, 2020, was $353,000. "The second was please provide observations about [Jamie's] analysis"; Krillenberger opined that Jamie conducted his work in a commercially reasonable manner. "[A]nd the third is please provide observations about . . . Agogliati's valuation." As to Agogliati's full valuation, Krillenberger stated, "[Agogliati] includes future projects and I think if [his] report had included the adjustments . . . — income taxes, recognition of government subsidies as they

- 421 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

were known at the time and, very importantly, development expenses, . . . — that report would indicate a value closer to mine."

As to Agogliati's critique and correction of Jamie's valuation, Krillenberger's "observation mostly focused around [Agogliati's] report's inclusion of future projects"; "it was unclear to me how some of those numbers were derived or their reliability."

In his own valuation, Krillenberger included the nine installed projects. He considered the other development projects but "assigned them a negligible value"; "the actual indication came up negative so we set it to zero." When asked if "[i]t's true that [he] knew that the previous appraisal used by these gentlemen included consideration and valuation of projects in development, 27 in number," Krillenberger replied, "I've read this page [of that appraisal] and it says what you said." Krillenberger did not include nonoperating assets in his valuation.

### 3. Jury Verdict and Judgment on Verdict

The jury was asked to decide whether Herink had met his burden to prove his breach of contract claim, i.e., that the purchase price offered by Bluestem under § 7.03(a) of the Operating Agreement was less than the "purchase price per Unit equal to the fair market value per Unit as determined by the Manager in his sole discretion, exercised in a commercially reasonable manner" on the date of Herink's termination of employment. If the jury found that Herink had met his burden of proof, then it was to determine the fair market value of the 12,150 membership units Herink owned on the date of the termination. On November 3, 2022, the jury returned a verdict in Herink's favor, and it determined the fair market value of his units was $2 million. The district court entered judgment on the verdict for Herink on November 7.

- 422 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

### 4. Posttrial Motions and Rulings

On November 8, 2022, Herink filed a motion for summary judgment on Bluestem's counterclaim, alleging there was no genuine issue as to any material fact concerning the counterclaim.

Also on November 8, 2022, Herink filed a "Motion to Tax Costs & Prejudgment Interest & Bill of Costs." Herink sought a prejudgment interest rate of 12 percent pursuant to Neb. Rev. Stat. § 45-104 (Reissue 2021). Herink noted that the postjudgment interest began to accrue at the rate published on the Nebraska Supreme Court website and that "[the] rate is 5.981%." The district court treated this motion as a motion to alter or amend the judgment.

In its amended order entered on December 2, 2022, the district court sustained Herink's motion for summary judgment, awarded prejudgment interest at the rate established by the parties' contract (1.53 percent), and awarded postjudgment interest at that same rate.

Bluestem appeals, and Herink cross-appeals.

## III. ASSIGNMENTS OF ERROR

Bluestem assigns that the district court erred in (1) denying its motion for a directed verdict and (2) granting summary judgment in favor of Herink on its counterclaim.

On cross-appeal, Herink assigns that the district court erred when it determined that (1) the prejudgment interest rate should be 1.53 percent, not 12 percent as provided by § 45-104, and (2) the postjudgment interest rate should be 1.53 percent, not 5.981 percent.

## IV. STANDARD OF REVIEW

[1] A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law. *Carson v. Steinke*, 314 Neb. 140, 989 N.W.2d 401 (2023).

- 423 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

[2] In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence. *Id.*

[3,4] An appellate court reviews a district court's grant of summary judgment de novo. *Pine Tree Neighborhood Assn. v. Moses*, 314 Neb. 445, 990 N.W.2d 884 (2023). An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law. *Id.* In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence. *Id.*

[5] On appeal, awards of prejudgment interest are reviewed de novo. *BCL Properties v. Boyle*, 314 Neb. 607, 992 N.W.2d 440 (2023).

## V. ANALYSIS

### 1. Bluestem's Appeal

#### (a) Motion for Directed Verdict

At issue in this breach of contract action is the provision in § 7.03(a) of Bluestem's Operating Agreement that upon termination of Herink's employment, with or without case, Herink had to sell and Bluestem had to buy all of Herink's membership units at a price "equal to the fair market value per Unit as determined by the Manager in his sole discretion, exercised in a commercially reasonable manner."

- 424 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

After Herink rested his case, Bluestem made a motion for a directed verdict. Bluestem argued:

> As the court is well aware, the operating agreement has a specific, mandatory provision on determining the price of fair market value — fair market value exercised in the sole discretion of the manager in a commercially reasonable manner. The evidence in the case that is presented by [Herink] excludes the sole discretion of the manager of Bluestem. In anticipating the responding argument from [Herink], I anticipate they will say this is a circular argument and the sole discretion of the manager of Bluestem assumed its own conclusion. Now that we are at the proof stage, that argument fails. [Herink] had every opportunity in a deposition and with . . . Crane on the stand to examine the issues of discretion and where he exercised it. They could have identified those discretionary decisions and built their fair market value in a commercially reasonable manner based upon those discretionary decisions. They chose not to and their argument to this court and to this jury is the jury chooses the fair market value, excluding the sole discretion of Bluestem's manager. That doesn't follow the contract and, as a matter of law, there should be a directed verdict.

The district court overruled the motion, at which time Bluestem proceeded with its case and called Krillenberger as its expert witness. After Bluestem rested its case, it renewed its motion for a directed verdict "for the same reasons that were previously argued, that the evidence does not support any determination that the fair market value as determined by the operating agreement has been proven to be not what was offered"; the motion was denied.

[6] On appeal, Bluestem assigns as error that the district court erred in overruling its motion for a directed verdict at the close of Herink's case in chief and at the close of all the evidence. However, a defendant who moves for a directed

- 425 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

verdict at the close of the plaintiff's evidence and, upon the overruling of such motion, proceeds with trial and introduces evidence, waives any error in the ruling on the motion. *Bradley T. & Donna T. v. Central Catholic High Sch.*, 264 Neb. 951, 653 N.W.2d 813 (2002). By proceeding with trial and introducing evidence, Bluestem waived any error in the district court's ruling on its motion for a directed verdict made at the close of Herink's case. However, Bluestem also claims the district court erred in overruling its motion for a directed verdict at the close of all the evidence. We therefore limit our analysis to Bluestem's motion for a directed verdict at the close of all the evidence.

Bluestem argues that "[a]ny valuation which fails to account for . . . Crane's sole discretion would deprive Bluestem of the benefit of its bargain under the Operating Agreement." Brief for appellant at 15. And "[e]ach effort by Herink to establish a fair market value per unit of Bluestem failed to include Crane's discretion, and that causes Herink's claims to fail." *Id.* "Here, the only evidence of a valuation that was performed in a manner consistent with the Operating Agreement was introduced by Bluestem." *Id.* at 16. Therefore, "the district court erred in failing to enter a directed verdict in favor of Bluestem." *Id.* at 17.

[7-9] A contract must receive a reasonable construction and must be construed as a whole. *Brush & Co. v. W. O. Zangger & Son*, 314 Neb. 509, 991 N.W.2d 294 (2023). If possible, effect must be given to every part of a contract. *Id.* A contract which is written in clear and unambiguous language is not subject to interpretation or construction; rather, the intent of the parties must be determined from the contents of the contract, and the contract must be enforced according to its terms. *Id.*

Additionally, Bluestem states that in *Benjamin v. Bierman*, 305 Neb. 879, 943 N.W.2d 283 (2020), the Nebraska Supreme Court "recognized that a party to an operating agreement that sets forth a method for valuing his interest in a limited liability company is bound by that methodology." Brief for

- 426 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

appellant at 15. Like the district court, we agree with Bluestem that the parties here agreed to a methodology for determining the unit price—i.e., under § 7.03(a) of the Operating Agreement, a price "equal to the fair market value per Unit as determined by the Manager in his sole discretion, exercised in a commercially reasonable manner"—and that Herink is bound by that methodology. But we also agree with the district court that "the gravamen of Herink's complaint is that Bluestem did not comply with the methodology agreed to by the parties because the determination of the purchase price of Herink's units was not done 'in a commercially reasonable manner.'"

Whether the determination of the purchase price of Herink's units was done in a commercially reasonable manner is a question of fact. See *Chadron Energy Corp. v. First Nat. Bank*, 236 Neb. 173, 459 N.W.2d 718 (1990) (issue of whether sale of collateral was done in commercially reasonable manner under Nebraska's version of Uniform Commercial Code is question of fact for jury to decide; because jury found bank failed to conduct foreclosure sale of secured stock in commercially reasonable manner, debtor was entitled to damages in amount of additional surplus it would have received if sale had been conducted in commercially reasonable manner).

In this case, Crane, as manager, determined that $410,350 was the fair market value of Herink's interest in Bluestem. Crane relied on Jamie's valuation analysis to determine the purchase price of Herink's membership units of Bluestem. Crane told Jamie which of Bluestem's projects to include in his valuation analysis but left the methodology of the valuation up to Jamie. Jamie used a discounted cashflow analysis to determine valuation. Crane said he took Jamie's valuation, "did the math, came up with the [amount per] unit, and then . . . added some," "roughly $50,000," because "we had worked together a long time and [Herink] and I really were the guys that started this"; "it's so hard to let someone go and, and I just wanted to give him extra money." Accordingly, Crane

- 427 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

determined that the aggregate purchase price for Herink's interest in Bluestem was $410,350.

Herink's expert, Agogliati, agreed that a discounted cash-flow methodology was a commonly accepted valuation method. However, going through Jamie's analysis, Agogliati "noted a number of things" that he "felt didn't make it in accordance with standard valuation procedure," the main points being the lack of independence (Jamie was Crane's brother and a Bluestem employee), the lack of consideration of future projects (because Bluestem was an ongoing business), the determination of the discount rate (too high in Agogliati's opinion), and the subtraction of future debt (something Agogliati said was not typically done at the valuation date). In his critique of Jamie's valuation, Agogliati was not determining the fair market value. Rather, Agogliati "showed corrections to show the impact of the errors [he] found in Jamie's approach" because Jamie's analysis "was not commercially reasonable." The point was "to correct noncommercially reasonable [sic] and remove bias as well." Agogliati calculated the impact of the errors in Jamie's approach was a range of approximately $1.7 million to $3 million for Herink's interest.

Additionally, when being questioned about a loan application he made and problems with one of his tax returns, Herink testified, "When Bluestem closed me out of the company, they filed their tax return to say they paid me $2 million." When asked how much he got, Herink replied, "Zero. But to the IRS, it looks like I owed 5-, $600,000 in taxes . . ." When asked if he was referring to an IRS schedule K-1, Herink replied, "Yes," his "2020 K-1." He said, "The K-1 closes me out of the [capital] account and, yes, the way the IRS reads it, I was paid . . . around $2 million."

In its brief, Bluestem points to Agogliati's testimony when, upon being asked if he attempted to incorporate into his valuation any discretion by Bluestem's manager, Agogliati replied, "I don't even know how you would do that." However,

- 428 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

that question and response were in relation to Agogliati's own determination of the fair market value of Herink's interests (between $7.06 million and $10.08 million), rather than his critique of Jamie's valuation.

Although Bluestem presented evidence that Crane's determination of $410,350 for the aggregate purchase price for Herink's interest in Bluestem was in accordance with § 7.03(a) of the Operating Agreement—i.e., a price "equal to the fair market value per Unit as determined by the Manager in his sole discretion, exercised in a commercially reasonable manner"—Herink presented evidence to the contrary. As noted above, Agogliati reviewed Jamie's analysis, which was the basis for Crane's determination of value, and testified that Jamie's analysis "was not commercially reasonable." In particular, Agogliati noted that Jamie's analysis lacked independence, lacked consideration of future projects, used too high of a discount rate, and subtracted future debt. Agogliati calculated that the impact of the errors in Jamie's approach was a range of approximately $1.7 million to $3 million for Herink's interest. Moreover, as noted above, Herink testified that his 2020 IRS schedule K-1 reflects a $2 million closeout of his capital account with Bluestem.

Herink was entitled to have every controverted fact resolved in his favor and have the benefit of every inference which can reasonably be deduced from the evidence. See *Carson v. Steinke*, 314 Neb. 140, 989 N.W.2d 401 (2023). In so doing, reasonable minds could differ and draw more than one conclusion as to whether Bluestem was in breach of contract when it offered Herink $410,350 for his interest in the company. Because reasonable minds could differ, a directed verdict would not have been proper. See *id.* Therefore, the district court did not err in denying Bluestem's motion for a directed verdict at the close of all the evidence. Additionally, we note that the jury's subsequent determination that Herink's membership units had a value of $2 million falls within the range that Agogliati calculated after he corrected for errors in

- 429 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

Jamie's valuation, as well as correlating to the amount Herink testified appeared in his 2020 IRS schedule K-1.

### (b) Summary Judgment

Following the jury's verdict in his favor and the district court's entry of judgment on the verdict, Herink filed a motion for summary judgment on Bluestem's counterclaim for declaratory judgment and specific performance. Herink alleged there was no genuine issue as to any material fact concerning the counterclaim. At the hearing on the motion for summary judgment, Herink's counsel stated, "I'm just looking for a way to get rid of that declaratory judgment action claim which I think goes away as a matter of law based on what's already happened." The district court stated, "I think we all agree that [Bluestem's] counterclaim has been taken care of by the jury verdict." The court subsequently entered a written order sustaining Herink's motion for summary judgment.

Bluestem argues that the district court erred in granting summary judgment in favor of Herink on Bluestem's counterclaim "[f]or the same reasons" that a directed verdict should have been entered in favor of Bluestem. Brief for appellant at 13. However, we have already found that a directed verdict would not have been proper in this case. Bluestem acknowledges that "[t]he parties and the district court understood going into the trial that Bluestem's counterclaim was the flip side of Herink's claim" and that "once the jury concluded that Herink had prevailed on his claim it necessarily followed that the counterclaim should be dismissed." Reply brief for appellant at 7. Accordingly, we find that the district court did not err when it sustained Herink's motion for summary judgment.

### 2. Herink's Cross-Appeal

Neither party disputes that prejudgment and postjudgment interest were due and owing in this case; the parties dispute only the applicable rates of interest. Bluestem believed the interest rate in the contract, 1.53 percent, applied to both prejudgment and postjudgment interest. Herink, on the

- 430 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

other hand, believed that the statutory rates—12 percent for prejudgment interest and 5.981 percent for postjudgment interest—should apply because the jury found that Bluestem had breached the contract. The district court awarded prejudgment and postjudgment interest at the contract rate of 1.53 percent. Herink claims that the court "chose the wrong rate" for prejudgment and postjudgment interest. Brief for appellee on cross-appeal at 37, 38.

### (a) Prejudgment Interest

[10] Pursuant to § 45-104:

> *Unless otherwise agreed, interest shall be allowed at the rate of twelve percent per annum on money due on any instrument in writing*, or on settlement of the account from the day the balance shall be agreed upon, on money received to the use of another and retained without the owner's consent, express or implied, from the receipt thereof, and on money loaned or due and withheld by unreasonable delay of payment. Unless otherwise agreed or provided by law, each charge with respect to unsettled accounts between parties shall bear interest from the date of billing unless paid within thirty days from the date of billing.

(Emphasis supplied.) See, also, *Weyh v. Gottsch*, 303 Neb. 280, 929 N.W.2d 40 (2019) (§ 45-104 authorizes prejudgment interest on four categories of contract-based claims without regard to whether claim is liquidated or unliquidated).

Section 7.03(e) of Bluestem's Operating Agreement states in relevant part:

> Purchases of Units by the Company and payment of the purchase price under this Section 7.03 may be . . . payment by delivery of a promissory note from the Company ("Promissory Note") to the Member (or Member's estate) providing for payment in three (3) equal annual installments commencing one year from the occurrence of the Mandatory Operative Event or Optional Operative

- 431 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

Event, as applicable. *The Promissory Note shall bear interest on the unpaid principal balance at an interest rate per annum equal to the Applicable Federal Rate for Mid-term obligations, as published by the* [*IRS*]*for the month of the Mandatory Operative Event* or Optional Operative Event, as applicable. Each installment or principal and accrued interest shall be paid annually on the anniversary of the date of the Promissory Note, and the Company shall have the right to prepay the Promissory Note at any time without premium or penalty.

(Emphasis supplied.) Thus, the Operating Agreement reflects an agreement on interest that is different from the 12-percent rate provided in § 45-104. An exhibit received into evidence at the hearing regarding interest and costs showed that the annual "Applicable Federal Rate[]" for "Mid-term" obligations in March 2020 was 1.53 percent. This was also the interest rate noted in Bluestem's April 25, 2020, promissory note to Herink.

As noted by Bluestem in its appellate brief, stipulations were made regarding the promissory note. At trial, Herink's counsel said, "[W]e'll stipulate that Bluestem attempted performance under the promissory note in accordance with its terms, and that . . . Herink declined them. So, there's no claim that Bluestem breached its obligations under the note. The claim is that Bluestem breached under the contract and it's the price that's wrong." Bluestem accepted the stipulation, and the district court said the stipulation would be accepted.

Herink argues that because the jury found that Bluestem breached its contract, Bluestem was precluded from benefiting from the contract interest rate, which was lower than the statutory interest rate. "Herink urges the Court to conclude that one who breaches a contract cannot claim benefits or advantages under the contract it breached if doing so provides benefits to the breaching party. He contends a party may not breach a contract and recover benefits under it as well." Brief for appellee on cross-appeal at 39. In support of his

- 432 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

argument that a party cannot claim benefits of a contract it breached, Herink cites to numerous cases, but those cases do not address how, if at all, a breach affects the determination of the applicable prejudgment interest rate that is at issue in the instant case.

We find that *Prudential Ins. Co. v. Greco*, 211 Neb. 342, 318 N.W.2d 724 (1982), is more to the point. In that case, the appellant was found liable to the appellee for certain amounts due under the terms of a lease. The district court entered an order awarding the appellee prejudgment interest. On appeal, the appellee challenged the amount of prejudgment interest. The Nebraska Supreme Court noted that the parties' lease provided for a 9-percent interest rate on rent or other sums not paid under the lease within 15 days after the same were due and payable. The court said § 45-104 provides that " '[u]*nless otherwise agreed*, interest shall be allowed at the rate of twelve per cent per annum . . . .' " *Prudential Ins. Co. v. Greco*, 211 Neb. at 347, 318 N.W.2d at 727 (emphasis in original). The court then stated that because the parties " 'otherwise agreed,' the provisions of § 45-104 were superseded" by the terms of the lease. *Prudential Ins. Co. v. Greco*, 211 Neb. at 347, 318 N.W.2d at 727. " 'Thus, if the contract provides for a certain rate of interest until the principal sum is paid . . . the contract governs until the payment of the principal or until the contract is merged in a judgment.' " *Id.* at 347-48, 318 N.W.2d at 728 (quoting 47 C.J.S. *Interest & Usury* § 40 a. (1982)). The court stated that prejudgment interest should have been awarded at a rate of 9 percent. *Prudential Ins. Co. v. Greco, supra*.

In the instant case, the Operating Agreement provided for an interest rate of 1.53 percent, as that was the annual "Applicable Federal Rate" for "Mid-term" obligations in March 2020. Thus, because the parties otherwise agreed, the provision of § 45-104 was superseded by the terms of the Operating Agreement and the district court did not err in awarding prejudgment interest at a rate of 1.53 percent.

- 433 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

We further note with regard to prejudgment interest, that the only issue raised to the district court and on appeal is the interest rate, not the date on which the prejudgment interest accrued. Section 7.03(c) of the Operating Agreement states that the company had the option to purchase Herink's membership units (1) "in a single sum payment made to Member on the one year anniversary of the Member's date of termination of employment" or (2) "through delivery of a promissory note and payment in accordance with Section 7.03(e)"; § 7.03(e) provided for payment by delivery of a promissory note allowing payment in three equal annual installments commencing 1 year from the occurrence of the mandatory event. Although the above language suggests there would not have been any interest accruing for the first year after Herink's termination of employment, and therefore arguably no prejudgment interest for that period, that issue was not raised by either party and does not rise to the level of plain error. See *County of Lancaster v. County of Custer*, 313 Neb. 622, 985 N.W.2d 612 (2023) (plain error is error plainly evident from record and of such nature that to leave it uncorrected would result in damage to integrity, reputation, or fairness of judicial process).

### (b) Postjudgment Interest

[11] Neb. Rev. Stat. § 45-103 (Reissue 2021) describes how to calculate the statutory postjudgment interest rate, which is "fixed at a rate equal to two percentage points above the bond investment yield, as published by the Secretary of the Treasury of the United States . . . in effect on the date of entry of the judgment." At the time of entry of judgment in the present case, the statutory postjudgment interest rate was 5.891 percent. "Interest as provided in section 45-103 shall accrue on decrees and judgments for the payment of money from the date of entry of judgment until satisfaction of judgment." Neb. Rev. Stat. § 45-103.01 (Reissue 2021). Further, the Nebraska Supreme Court has stated, "Construing § 45-103.01 and § 45-104 together, we hold that prejudgment interest

- 434 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

under § 45-104 ends, and postjudgment interest begins, on the date of entry of judgment." *Weyh v. Gottsch*, 303 Neb. 280, 316, 929 N.W.2d 40, 64 (2019). However, § 45-103 also states that "[t]his interest rate shall not apply to . . . [a]n action founded upon an oral or written contract in which the parties have agreed to a rate of interest other than that specified in this section."

Bluestem contends that "a rate of interest has been agreed upon, and the same contract that Herink sued upon is the contract that contains the interest rate." Reply brief for appellant at 18. "Accordingly, the district court did not err when it followed . . . § 45-103 and enforced the parties' agreement on the applicable interest rate." Reply brief for appellant at 18.

Herink argues that the contract's 1.53-percent interest rate "cannot stand for all the reasons argued concerning [the prejudgment interest rate]." Brief for appellee on cross-appeal at 44. He contends that *Weyh v. Gottsch, supra*, "mandates that the prejudgment interest rate continues until the judgment is entered [and that] [t]hen, the post-judgment law applies." Brief for appellee on cross-appeal at 44. He further argues that "interest is accruing on a *Judgment*, not a *contract*." Reply brief for appellee on cross-appeal at 8 (emphasis in original). Herink contends that the parties did not contract for a postjudgment interest rate and that therefore, the statutory judgment interest rate should control.

Herink states that "[n]o direct Nebraska precedent has been located on the governing post-judgment interest rate," but that federal courts "permit parties to contract for a postjudgment interest rate which differs from the federal rate that would ordinarily apply, as long as they do so through 'clear, unambiguous and unequivocal language' and those rates do not violate state usury or other applicable laws." Reply brief for appellee on cross-appeal at 9. See, *FCS Advisors, Inc. v. Fair Finance Co., Inc.*, 605 F.3d 144, 149 (2d Cir. 2010) (in addressing whether federal or state postjudgment interest should be applied, held: (1) "In diversity cases such as

- 435 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

this, post-judgment interest should ordinarily be calculated in accordance with the federal rate," and (2) "[a]lthough parties may agree to a different rate by contract, absent 'clear, unambiguous and unequivocal' language expressing an intent that a particular interest rate apply to *judgments* or *judgment debts,* a general choice-of-law provision such as the one at issue here does not alter the application of the federal rate to the calculation of post-judgment interest"); *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 102 (2d Cir. 2004) (parties' yearly interest rate specified in purchase agreement applied from date payment due to date payment made; parties failed to state rate would apply to judgments rendered on award and therefore did not contract out of federal postjudgment interest rate; general rule under New York and federal law is that debt created by contract merges with judgment entered on contract, so contract debt is extinguished and only judgment debt survives; under New York law, contract language stating that particular interest rate will accrue on debt until date of payment is interpreted as applying to debt itself, and not judgment into which debt is merged; if parties want to override general rule on merger and specify postjudgment interest rate, they must express intent through "'clear, unambiguous and unequivocal' language"); *In re Riebesell*, 586 F.3d 782 (10th Cir. 2009) (parties did not contract for postjudgment interest rate percentage; therefore, federal rate applies; general rule that cause of action reduced to judgment merges into judgment and contractual interest rate disappears for postjudgment purposes; if parties want to override general rule on merger and specify postjudgment interest rate, they must express intent through clear, unambiguous and unequivocal language); *Jack Henry & Assocs., Inc. v. BSC, Inc.*, 487 F. Appx. 246 (6th Cir. 2012) (default contractual interest rate, without more, cannot govern postjudgment interest rate because, upon reduction to judgment, original claim no longer exists; agreement's bare choice-of-law provision insufficient to replace default rule that federal rate applies to calculation of postjudgment interest in diversity cases).

- 436 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

Herink urges this court "to adopt the federal rule." Reply brief for appellee on cross-appeal at 10. We find the federal approach to be consistent with the legal principle that when a contract is reduced to a judgment, the contract ceases to exist and the contract governs only until payment of principal or until the contract is merged into a judgment. See, *American Nat. Bank v. Medved*, 281 Neb. 799, 801 N.W.2d 230 (2011) (as general rule, when claim on contract is reduced to judgment, contract between parties is voluntarily surrendered and canceled by merger in judgment and ceases to exist); *Prudential Ins. Co. v. Greco*, 211 Neb. 342, 318 N.W.2d 724 (1982) (contract governs until payment of principal or until contract is merged in judgment). The federal approach is also consistent with § 45-103(2) in that it allows parties to agree to a rate of interest other than the statutory postjudgment rate.

However, the federal authority set forth above also requires that for contract terms to override the general rule on merger and the application of a statutory postjudgment interest rate, the contract must express that intent through clear, unambiguous, and unequivocal language. See, *FCS Advisors, Inc. v. Fair Finance Co., Inc.*, 605 F.3d 144 (2d Cir. 2010); *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96 (2d Cir. 2004); *In re Riebesell*, 586 F.3d 782 (10th Cir. 2009). While it certainly makes sense to require the contract to set forth a statutory postjudgment interest rate unambiguously and unequivocally rather than just generally setting forth an interest rate for amounts due and unpaid, we have been unable to find any Nebraska precedent requiring such specificity in the contract for postjudgment interest purposes. In fact, in the Nebraska cases we found that touched on the postjudgment interest issue before us presently, the Supreme Court and this court construed generally asserted contract interest rates to be appropriately applied, if not required, for postjudgment interest purposes.

In one case involving multiple apartment construction projects, judgments were entered against the defendants based

- 437 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

on written and oral contracts and prejudgment and postjudgment interest was awarded to the plaintiff for some of the projects. See *Folgers Architects v. Kerns*, 262 Neb. 530, 633 N.W.2d 114 (2001). Regarding two apartment projects, the written contracts stated that payments due and unpaid would "'bear interest from the date payment is due at the rate entered below, or in the absence thereof, at the legal rate prevailing.'" *Id*. at 540, 633 N.W.2d at 122. Although no interest rate was stated in the contract, testimony established that the prevailing interest rate was 18 percent per annum. Prejudgment interest was awarded by the district court, and postjudgment interest was awarded at 18 percent per annum. The prejudgment interest was reversed on appeal to this court, and on petition for further review, the Nebraska Supreme Court agreed.

In considering arguments related to the prejudgment interest issue, the Supreme Court pointed out that § 45-103(2) "expressly provides that the general statutory rate does not apply to a 'written contract in which the parties have agreed to a rate of interest other than that specified in this section.'" *Folgers Architects v. Kerns*, 262 Neb. at 541, 633 N.W.2d at 123. The court also pointed out that § 45-104 similarly allows for the parties to agree to an interest rate other than the 12-percent interest rate set forth in that statute. Therefore, when addressing the issue of prejudgment interest, the court found that the statutory language allowed parties to contract for the rate of interest to be applied to unliquidated and liquidated claims. However, the court agreed with this court that the statutory conditions for awarding prejudgment interest were not met, because the claims were unliquidated. (We note here that the Supreme Court has since held Neb. Rev. Stat. § 45-103.02 (Reissue 2021) and § 45-104 to be alternate and independent statutes authorizing the recovery of prejudgment interest and that § 45-104 authorizes prejudgment interest on certain categories of contract-based claims without regard to

- 438 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

whether the claim is liquidated or unliquidated. See *Weyh v. Gottsch*, 303 Neb. 280, 929 N.W.2d 40 (2019)).

In attempting to bolster its argument related to allowing prejudgment interest, the plaintiff in *Folgers Architects v. Kerns* argued that "the Court of Appeals allowed postjudgment interest at the contract rates" (18 percent) and that "such an allowance" was "'wholly inconsistent'" with the court's "refusal to allow prejudgment interest at the contract rates." 262 Neb. at 543, 633 N.W.2d at 124. In response, the Supreme Court pointed out that postjudgment interest is awarded pursuant to § 45-103.01, which states that interest "provided in section 45-103 shall accrue on decrees and judgments for the payment of money from the date of entry of judgment until satisfaction of judgment." The court further stated:

> *The reference in* [*§ 45-103.01*] *to § 45-103 allows the provision in the written contract as to rate of interest to apply*, just as in § 45-103.02. The difference, however, is that § 45-103.01 contains no further conditions on the award of postjudgment interest, in contrast to § 45-103.02 regarding prejudgment interest. Consequently, *there is no inconsistency in the application of the contract rate for postjudgment interest*.

*Folgers Architects v. Kerns*, 262 Neb. 530, 544, 633 N.W.2d 114, 124-25 (2001) (emphasis supplied). Our reading of the italicized language above is that the contract interest rate related to amounts owed under the contract should also be applied as the postjudgment interest rate. And, at least at this time in Nebraska, this determination is made (1) without consideration of whether the parties specified a postjudgment interest rate through clear, unambiguous, and unequivocal language, see federal authorities previously cited and (2) without regard for the legal principle that when a claim on contract is reduced to judgment, the contract is canceled by merger in judgment and ceases to exist. See, *American Nat. Bank v. Medved*, 281 Neb. 799, 801 N.W.2d 230 (2011) (as general rule, when claim on contract is reduced to judgment,

- 439 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

contract between parties is voluntarily surrendered and canceled by merger in judgment and ceases to exist). See, also, *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96 (2d Cir. 2004) (debt created by contract merges with judgment entered on contract; contract interest rate accrues on debt itself, but not judgment into which debt is merged unless intent to override general rule on merger is expressly stated); *In re Riebesell*, 586 F.3d 782 (10th Cir. 2009) (contractual rate disappears for postjudgment purposes unless expressed through clear, unambiguous, and unequivocal language).

We also observe that in *Heritage Bank v. Bruha*, 283 Neb. 263, 812 N.W.2d 260 (2012), the parties agreed that a default contract rate of 11.75 percent per annum would be used for postjudgment interest purposes; the Supreme Court referenced that agreement and then confirmed that the prejudgment interest awarded in that case should be included in the final judgment for purposes of calculating postjudgment interest.

Finally, in an unpublished opinion, this court reversed a district court's order that had applied the statutory postjudgment interest rate instead of the contract rate set forth in the promissory notes at issue. See *Schmidt v. Sportsman's Gallery, LLC*, No. A-21-008, 2022 WL 29478 (Neb. App. Jan. 4, 2022) (selected for posting to court website). In *Schmidt v. Sportsman's Gallery, LLC*, three promissory notes executed by the appellants in favor of a bank included an agreed-upon interest rate for the unpaid principal balance. The district court calculated prejudgment interest using the interest rates in the promissory notes but ordered postjudgment interest at the statutory judgment interest rate. This court pointed out that each of the promissory notes at issue had an agreed-upon interest rate for the unpaid principal balance and that therefore, "[t]he district court should have awarded postjudgment interest based upon these agreed upon interest rates, rather than upon the judgment rate set forth in § 45-103." *Schmidt v. Sportsman's Gallery, LLC*, 2022 WL 29478 at *8.

- 440 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

In the instant case, the Operating Agreement provided for an interest rate of 1.53 percent, as that was the annual "Applicable Federal Rate" for "Mid-term" obligations in March 2020, the month that Herink's employment was terminated. Thus, because the parties otherwise agreed, and based upon the Nebraska cases set forth above, we conclude that § 45-103 was superseded by the terms of the Operating Agreement and that the district court did not err in awarding postjudgment interest at the contract rate of 1.53 percent.

## VI. CONCLUSION

For the reasons stated above, we affirm the decision of the district court.

Affirmed.

Riedmann, Judge, concurring in part, and in part dissenting.

Although I agree with the majority's opinion regarding the appeal of Bluestem Energy Solutions, LLC (Bluestem), I disagree with its analysis of Adam R. Herink's cross-appeal. The majority cites § 7.03(e) of the parties' "Second Amended and Restated Operating Agreement" (the Operating Agreement) to conclude that "the Operating Agreement reflects an agreement on interest that is different from the 12-percent rate provided in [Neb. Rev. Stat.] § 45-104 [(Reissue 2021)]." When I read § 7.03 as a whole, however, I reach a different conclusion. As pertinent to my analysis, § 7.03 of the Operating Agreement provides:

(a) Upon the occurrence of a Mandatory Operative Event under Section 7.02(a), or if the Company exercises its option to purchase any Units pursuant to Section 7.02(b), the Company shall pay the Member a purchase price per Unit equal to the fair market value per Unit as determined by the Manager in his sole discretion, exercised in a commercially reasonable manner. . . .

. . . .

(c) In the event of a purchase of Units pursuant to Section 7.02(a)(ii) payment because of the termination

- 441 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

of employment of the Member, at the Company's option, payment for the purchased Units may be made: (i) in a single sum payment made to Member on the one year anniversary of the Member's date of termination of employment, or (ii) through delivery of a promissory note and payment in accordance with Section 7.03(e) below.

. . . .

(e) . . . Purchases of Units by the Company and payment of the purchase price under this Section 7.03 may be, at the option of the Company, either (i) by payment of the entire price by cash or check (if the single sum payment option is elected by the Company), or (ii) payment by delivery of a promissory note from the Company ("Promissory Note") to the Member (or Member's estate) providing for payment in three (3) equal annual installments commencing one year from the occurrence of the Mandatory Operative Event or Optional Operative Event, as applicable. The Promissory Note shall bear interest on the unpaid principal balance at an interest rate per annum equal to the Applicable Federal Rate for Mid-term obligations, as published by the Internal Revenue Service for the month of the Mandatory Operative Event or Optional Operative Event, as applicable.

The majority concludes that because Bluestem opted to tender a promissory note, the applicable interest rate was provided in the Operating Agreement, and that therefore, the statutory rate contained in § 45-104 is inapplicable. Section 45-104 states:

Unless otherwise agreed, interest shall be allowed at the rate of twelve percent per annum on money due on any instrument in writing, or on settlement of the account from the day the balance shall be agreed upon, on money received to the use of another and retained without the owner's consent, express or implied, from the receipt thereof, and on money loaned or due and withheld by unreasonable delay of payment. Unless otherwise agreed

- 442 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

or provided by law, each charge with respect to unsettled accounts between parties shall bear interest from the date of billing unless paid within thirty days from the date of billing.

Giving plain meaning to the language of the Operating Agreement, the parties agreed that Bluestem could pay Herink the fair market value of his membership units either with a single payment 1 year following his termination of employment or through a promissory note in which payment would be made annually in three equal installments beginning on the 1-year anniversary of such termination. It is only under this second method that the parties agreed that a set interest rate would apply to the unpaid sums.

This language is considerably different from the contractual language applied by this court in *Ramaekers, McPherron & Skiles, P.C. v. Ramaekers*, No. A-93-068, 1994 WL 466476 (Neb. App. Aug. 30, 1994) (not designated for permanent publication), in which we modified a judgment to award a contractual interest rate. The agreement before us there unequivocally set forth an interest rate to be paid under the only method for payment provided in the agreement, stating:

> "All sums due the shareholder pursuant to paragraph 2 for the value of the stock as therein defined shall be paid by the corporation to the shareholder or his estate, as the case may be, in 120 equal monthly installments plus interest at ten percent (10%) per annum, which interest shall commence on the twentieth day after the shareholder's termination, with the first payment of principal plus interest to be paid commencing fifty days following the shareholder's termination."

*Id*. at *11 (emphasis omitted). Based upon the plain language of the agreement, we determined that the parties agreed that interest would accrue on the unpaid sums at the rate of 10 percent per annum.

The majority relies upon *Prudential Ins. Co. v. Greco*, 211 Neb. 342, 318 N.W.2d 724 (1982), to conclude that the

- 443 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

contractual rate in the Operating Agreement was the applicable prejudgment interest rate. However, the applicable contractual language in *Prudential Ins. Co.* stated:

> "If any rent or other sums due and payable under this lease are not paid by the Tenant within fifteen (15) days after same are due and payable, it is agreed that the rent or other sums payable . . . shall bear interest at the rate of nine percent (9%) per annum from fifteen (15) days after same are due and payable until paid."

211 Neb. at 346-47, 318 N.W.2d at 727. Hence, a set interest rate on any unpaid sum was unequivocal and the Nebraska Supreme Court aptly applied the contractual rate despite its being lower than the statutory rate.

While I agree that *Prudential Ins. Co. v. Greco, supra*, negates Herink's argument that one who breaches a contract cannot claim benefits or advantages under the contract it breached, I disagree that it guides our decision in the present case, due to the difference in the contractual language. In *Prudential Ins. Co.*, the lease at issue set forth an interest rate on any rent or other sums due and payable if not paid within 15 days. The Operating Agreement before us sets forth no explicit interest rate on amounts due; rather, an interest rate applies only if Bluestem elects to pay fair market value for Herink's membership units pursuant to a promissory note. Section 7.03(a) required Bluestem to pay "a purchase price per Unit equal to the fair market value per Unit as determined by the Manager in his sole discretion, exercised in a commercially reasonable manner." Sections 7.03(c) and 7.03(e) gave Bluestem two payment options, a lump-sum payment or a 3-year promissory note that included a specified interest rate. Although Bluestem tendered a promissory note, it was not based upon the fair market value of Herink's membership units; therefore, Bluestem's promissory note did not meet the requirements of § 7.03 and the interest rate contained in § 7.03(e) is not applicable. Unlike the parties in *Prudential Ins. Co.*, Herink and Bluestem did not agree to a specified interest

- 444 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

rate on *any* unpaid sums; rather, they agreed that if a promissory note were issued for the fair market value of the units, interest would accrue at an agreed rate.

A series of hypothetical questions further illustrates the illusory nature of an agreed-upon interest rate: Had Bluestem opted to tender a lump-sum payment under the first payment option, would it then be assessed the statutory interest rate because the Operating Agreement is silent as to an interest rate for a lump-sum payment? And if so, can it be said that the parties "otherwise agreed" to an interest rate as contemplated by § 45-104 when the rate is dependent upon a future unilateral decision by the breaching party? Does that interest rate apply when the promissory note fails to equal a fair market sum? I posit that the parties agreed to an interest rate on a promissory note offering fair market value of the units; where no such promissory note was tendered, no agreement on the interest rate exists.

Based upon a reading of § 7.03 of the Operating Agreement as a whole, Bluestem was required to purchase Herink's membership units at a price equal to the fair market value per unit as determined by the manager in his sole discretion, exercised in a commercially reasonable manner. Payment was to be made either in a single-sum payment on the 1-year anniversary of Herink's termination of employment or through delivery of a promissory note providing payment in three equal annual installments commencing 1 year from such termination date and bearing interest on the unpaid principal balance at a rate set forth therein. Although Bluestem tendered a promissory note, it was not for the fair market value of Herink's membership units; therefore, the contractual interest rate that the parties agreed upon for a promissory note equal to the fair market value of a member's units is inapplicable.

Because my reading of § 7.03 of the Operating Agreement leads me to conclude that the parties did not "otherwise agree" to an interest rate as contemplated by § 45-104, neither prejudgment nor postjudgment interest is governed by

- 445 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
HERINK v. BLUESTEM ENERGY SOLUTIONS
Cite as 32 Neb. App. 410

the Operating Agreement. I would reverse that portion of the district court's order awarding interest based upon the parties' alleged agreement and instead apply the applicable statutory rates. I agree with the remainder of the majority's opinion.